**In the United States District Court**
**Northern District of Texas**
**Wichita Falls Division**

STATE OF TEXAS,
      PLAINTIFFS,

v.

UNITED STATES DEPARTMENT OF JUSTICE;
TODD BLANCHE, IN HIS OFFICIAL CAPACITY
AS ACTING UNITED STATES ATTORNEY
GENERAL, DAREN K. MARGOLIN, IN HIS
OFFICIAL CAPACITY AS DIRECTOR OF THE
EXECUTIVE OFFICE FOR IMMIGRATION
REVIEW,
      DEFENDANTS

CIVIL CASE NO. X:XX-CV-XXXXX

**STATE OF TEXAS ORIGINAL COMPLAINT**

1.      The State of Texas ("Texas" or "Plaintiff") challenges a final rule issued by the Department of Justice (DOJ) permitting immigration judges ("IJs") and the Board of Immigration Appeals ("BIA" or "Board") to dispose of removal cases without final adjudication, by using administrative closure to effectively grant indefinite amnesty to aliens illegally present in this country. *See* Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 88 Fed. Reg. 62,242 (Sept. 8, 2023) ("Administrative Closure NPRM"); Efficient Case and Docket Management in Immigration Proceedings, 89 Fed. Reg. 46,742 (May 29, 2024) ("Administrative Closure Rule").

2.      The Administrative Closure Rule drastically expands the use of administrative closure, transforming it from a docket management tool into indefinite permission to remain in the United States for aliens who would otherwise be subject to removal proceedings. Inter alia, the Rule requires IJs to administratively close removal cases upon motion by both parties or by one party

when the motion is unopposed and grants broad discretion to IJs to close cases on an opposed motion. *Id.* at 46787 (8 C.F.R. § 1003.1(d)(ii); § 1003.1(l)(1), (3); § 1003.10; § 1003.18(c)).

3.      However, the Immigration and Nationality Act ("INA") does not countenance the use of administrative closure to suspend removal cases but instead directs that "[a]t the conclusion of the proceeding the immigration judge shall decide whether an alien is removable from the United States." 8 U.S.C. § 1229a(c)(1)(A).

4.      The Administrative Closure Rule constituted one part of the Biden-Harris Administration's campaign to undermine our immigration laws. Among other tools the Biden-Harris Administration abused was to treat "prosecutorial discretion" as a pretexual justification for abdicating their duty to enforce our immigration laws.

5.      The predictable result of the Biden-Harris Administration's derelict immigration policies was the largest surge of immigrants—mostly illegal immigrants—into the United States in the nation's history. *See, e.g.*, Ronny Reyes & Jennie Taer, *US immigration surge under Biden administration is biggest in US history—outpacing the days of Ellis Island*, N.Y. Post, Dec. 11, 2024, https://perma.cc/W6SB-S92J; Steven A. Camarota & Karen Zeigler, *Foreign-Born Number and Share of U.S. Population at All-Time highs in January 2025*, Center for Immigration Studies, March 12, 2025, https://tinyurl.com/3z8mvu7h (noting that net foreign-born population growth during the four years of the Biden-Harris Administration exceeded the prior 12 years, estimating that 11.5 to 12.5 million legal and illegal immigrants settled in the country during that period, and estimating that illegal immigrants accounted for approximately two-thirds of that migration).

6.      Undeterred by these consequences, the Biden-Harris Administration then took the unlawful step of substantially expanding the concept of administrative closure in immigration

2

hearings before immigration judges ("IJs") and Appellate Immigration Judges of the Executive Office for Immigration Review ("EOIR"). *See* Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 88 Fed. Reg. 62,242 (Sept. 8, 2023) ("Administrative Closure NPRM"); Efficient Case and Docket Management in Immigration Proceedings, 89 Fed. Reg. 46,742 (May 29, 2024) ("Administrative Closure Rule").

7.    In theory, administrative closure is a procedural tool that allows IJs or the BIA to "temporarily remove a case from an Immigration Judge's active calendar or from the Board's docket." *Centro Legal de la Raza v. Exec. Off. For Immigration Review* (hereinafter "*Centro Legal*"), 524 F. Supp. 3d 919, 938 (N.D. Cal. 2021) (quoting *Matter of Avetisyan*, 25 I. & N. Dec. 688, 692 (BIA 2012)). The most common justification for the practice is to conserve resources by administratively closing a case while an alien pursues some other form of relief (for example, to avoid fully litigating EOIR proceedings that may just be mooted by a parallel USCIS adjudication for relief).

8.    In practice, however, administrative closure is most often treated as a form of indefinite immigration relief itself—one that has never been authorized by Congress. The overwhelming majority of administratively closed cases are never reopened. *See Hernandez-Serrano v. Barr*, 981 F.3d 459, 463 (6th Cir. 2020) (noting 283,366 cases administratively closed from fiscal year 1980-2011, with a major uptick to an additional 215,285 cases administratively closed from fiscal year 2012-2017, and that, at the end of fiscal year 2017, approximately 355,835 cases *remained* administratively closed). The average time a case is administratively closed at the immigration court level is approximately 16.5 years, and at the BIA level, approximately 29 years. These averages do not reflect "temporary" action by any reasonable definition.

9. "The result of administrative closure, as described above, is that immigration cases leave an IJ's active calendar and, more often than not, never come back. Thus[,] the reality is that, in hundreds of thousands of cases, administrative closure has amounted to a decision not to apply the Nation's immigration laws at all." *Hernandez-Serrano*, 981 F.3d at 463.

10. Combined with Department of Homeland Security ("DHS") guidance that explicitly discouraged bringing or continuing removal proceedings against the vast majority of illegal aliens, administrative closure became an unauthorized, lawless form of immigration relief to be abused by open-borders politicians.

11. The Final Administrative Closure Rule incentivizes illegal immigration, protects illegal aliens who are otherwise ineligible for relief from removal

**PARTIES**

## I. Plaintiff

12. Plaintiff State of Texas is a sovereign State of the United States of America

## II. Defendants

13. Defendants the United States Department of Justice ("DOJ") is a cabinet-level federal executive agency that oversees Defendant, Executive Office for Immigration Review. DOJ and EOIR are responsible for adjudicating removal proceedings.

14. Defendant Todd Blanche is the Acting Attorney General of the United States. Plaintiff sues him in his official capacity.

15. Daren K. Margolin is the Director of EOIR. Plaintiff sues him in his official capacity.

4

**JURISDICTION AND VENUE**

16.    The Court has jurisdiction over this dispute because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 702-703. The Court has jurisdiction under 5 U.S.C. §§ 705-706 and 28 U.S.C. §§ 1361 and 2201-2202 to render the declaratory and injunctive relief that the Plaintiff requests.

17.    This district is a proper venue because the State of Texas resides in this district and a substantial part of the events and omissions giving rise to the claim occurred here. 28 U.S.C. § 1391(b), (e).

**FACTS**

**I.    EOIR is Statutorily Tasked with Adjudicating Removal Cases**

18.    DHS initiates removal proceedings against an alien illegally present in the United States or otherwise potentially subject to removal by issuing a "Notice to Appear" to the alien. 8 U.S.C. § 1229(a).

19.    From there, an EOIR IJ is charged with conducting the proceedings for determining the admissibility or removability of the alien. 8 U.S.C. § 1229a.

20.    With limited exceptions, such as expedited removal under 8 U.S.C. § 1228, "a proceeding under [Section 1229a] shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3).

21.    Immigration Judges are not authorized to exercise discretion with respect to whether a removable alien ought to be adjudicated removable and removed. Rather, 8 U.S.C. § 1229a(c)(1)(A) directs: "At the conclusion of the proceeding the immigration judge shall decide

5

whether an alien is removable from the United States. The determination of the immigration judge shall be based only on the evidence produced at the hearing."

22.    Neither Section 1229a(c)(1)(A) nor any other element of the INA authorizes an IJ or Appellate IJ to discretionarily decline to conclude a proceeding, conclude a proceeding without reaching a conclusion on removability, or to reach a conclusion other than that an alien is either removable or not removable. In other words, the plain language of the statute directs the IJ to reach a conclusion on removability based solely on the evidence presented at the hearing.

23.    Similarly, nothing in the statute authorizes IJs to consider factors that Congress has not made relevant to the legal question of removability.

## II. EOIR Case Loads have skyrocketed, so the first Trump Administration promulgated the AA96 Rule to Ensure Efficient Adjudication.

24.    During the first quarter of the 21st century, EOIR caseloads skyrocketed. EOIR had a backlog of approximately 130,000 pending cases in 1998, but approximately 1.08 million cases by the end of FY 2019. *See* Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 52,491 (Aug. 26, 2020) (the "AA96 NPRM"). By July 2023, this number had more than doubled to a backlog of over 2.2 million cases. *See* Elizabeth Jacobs & Julie Axelrod, *Comment Re: Appellate Procedures and Decision Finality in Immigration Proceedings; Administrative Closure* (A Comment on the Proposed Administrative Closure rule), CENTER FOR IMMIGRATION STUDIES (Nov. 7, 2023) https://perma.cc/T4MG-GFRD ("CIS Comment") (citing EOIR statistics).

25.    To curtail this massive increase in EOIR's backlog, the Trump Administration, in August of 2020, promulgated a notice of proposed rulemaking to streamline EOIR procedures and enhance efficiency of adjudication. *See* AA96 NPRM, 85 Fed. Reg. 52,491.

6

26.     Among other provisions, the AA96 NPRM clarified that controlling regulations "provide no freestanding authority for immigration judges or BIA members to administratively close immigration cases absent an express regulatory or settlement basis to do so." 85 Fed. Reg. at 52,492.

27.     Administrative closure has been described as "a procedural tool created for the convenience of the Immigration Courts and the Board" to "temporarily remove a case from an Immigration Judge's active calendar or from the Board's docket." *Matter of Avetisyan*, 25 I&N Dec. 688, 690, 692 (BIA 2012). In theory, administrative closure is a tool to permit IJs and the Board to manage their dockets under unusual circumstances, such as when an alien may be eligible for relief from removal governed by another administrative body, such as USCIS, and allowing the parallel proceeding to reach its conclusion could moot or otherwise help resolve the removal proceeding.

28.     In practice, however, administrative closure became a form of unofficial amnesty for hundreds of thousands of illegal aliens. As the Attorney General found in 2018, "[a]lthough described as a temporary suspension, administrative closure is effectively permanent in most instances." *Matter of Castro-Tum*, 27 I&N Dec. 271, 272 (A.G. 2018). As of 2018, "[s]ince 1980, immigration judges have recalendared less than a third of administratively closed cases." *Id*. at 273. "[A]dministrative closure often functions as a de facto amnesty program with benefits—*i.e.*, providing illegal aliens both indefinite employment authorization and indefinite protection from removal—which wholly belies its characterization as merely a docket management tool." EXEC. OFF. FOR IMMIGRATION REV., U.S. DEP'T OF JUST., *Policy Memorandum 25-29: Cancellation of Director's Memorandum* 22-03 at 6 (Apr. 18, 2025) (hereinafter "PM 25-29").

29.     Thus, DHS determined in 2020 that "administrative closure of cases by the immigration judges or the Board, especially the unilateral use of administrative closure, failed as a policy matter and is unsupported by the law." AA96 NPRM, 85 Fed. Reg. at 52,504. Accordingly, the AA96 NPRM proposed revising DOJ regulations to clarify that: "Nothing in this paragraph nor in any regulation contained in 8 CFR part 1240 shall be construed as authorizing an immigration judge to administratively close or suspend adjudication of a case unless a regulation promulgated by the Department of Justice or a previous judicially approved settlement expressly authorizes such action." *Id*. at 52,513.

30.     The AA96 Final Rule substantially adopted this language. Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 81,588, 81,655 (Dec. 16, 2020) ("AA96 Final Rule") ("Nothing in this paragraph (b) nor in any regulation contained in part 1240 of this chapter shall be construed as authorizing an immigration judge to administratively close or otherwise defer adjudication of a case unless a regulation promulgated by the Department of Justice or a previous judicially approved settlement expressly authorizes such an action.")

31.     In doing so, DOJ emphasized that the broad administrative closure authority in effect prior to AA96 operated, in practice, as an unauthorized form of case termination, 85 Fed. Reg. at 81,599 ("[I]n practice, unlike continuances, administrative closure has at times been used to effectively terminate cases through indefinite delay.") and was contrary to law. *Id*. ("[R]egardless of policy preferences, the Attorney General has determined that the expansive version of administrative closure preferred by commenters [that is, the version in effect prior to AA96] is incompatible with existing law and does not warrant a delegation of such authority.").

32.     DOJ concluded that indefinitely delaying cases was not a form of "efficiency" that comported with EOIR's statutory duty to adjudicate immigration proceedings. *Id*. at 81,598. To the contrary, to reduce the backlog of cases in a lawful and meaningful way, DOJ concluded that "an immigration judge [is] required both to complete a case and to complete it through only one of three avenues: An order of termination, an order of removal, or an order of relief or protection." AA96 NPRM, 85 Fed. Reg. at 52,496. Any other disposition, including faux termination through indefinite administrative closure, violates EOIR's statutory responsibility to "decide whether an alien is removable from the United States." 8 U.S.C. § 1229a(c)(1)(A).

### III. The Biden-Harris Administration launched a lawless campaign to undermine U.S Immigration Policies.

33.     From the earliest days of the Biden-Harris Administration, it was clear that neither statutory law nor the constitutional directive that the Executive is to take care that the law be faithfully executed would have much influence over the Biden-Harris Administration's immigration policies. To the contrary, the Biden-Harris Administration launched a comprehensive campaign to actively undermine the immigration policies favored by strong majorities of the American people and written into law by their representatives in Congress.

34.     One of the most insidious tools the Biden-Harris Administration used to undermine immigration law was to abuse prosecutorial discretion. This abuse included promulgating policies that expressly discouraged immigration enforcement of any kind against most illegal aliens.

35.     In a September 30, 2021, memorandum, then-Secretary of Homeland Security Alejandro Mayorkas described "the exercise of prosecutorial discretion" as the "foundational principle" for the enforcement of civil immigration laws. Alejandro Mayorkas, *Guidelines for the*

*Enforcement of Civil Immigration Law*, Sept. 30, 2021, https://perma.cc/DV58-K76U ("Mayorkas Memorandum").

36.    Going further, the Mayorkas Memorandum proclaimed that, as a matter of policy (and contrary to the Executive's constitutional duty to faithfully execute the law): "The fact an individual is a removable noncitizen therefore should not alone be the basis of an enforcement action against them."

37.    In other words, as a matter of departmental policy, immigration enforcement was to essentially cease against illegal aliens who were not perceived to be threats to the Biden-Harris Administration's lax definitions of national security, public safety, or border security.

38.    The memorandum also listed an extensive raft of caveats to ensure that even an alien who *was* such a threat to this country need not, necessarily, fear removal.

39.    For example, an illegal alien who had committed crimes in addition to their immigration violations could nonetheless enjoy the unauthorized and unofficial amnesty of "prosecutorial discretion" as a matter of policy based on:

- advanced or tender age;

- lengthy presence in the United States

- a mental condition that may have contributed to the criminal conduct, or a physical or mental condition requiring care or treatment;

- status as a victim of crime or victim, witness, or party in legal proceedings;

- the impact of removal on family in the United States, such as loss of caregiver;

- whether the noncitizen may be eligible for humanitarian protection or other immigration relief;

- military or other public service of the noncitizen or their immediate family;

- time since an offense and evidence of rehabilitation;

- conviction was vacated or expunged.

Mayorkas Memorandum at 3–4. In other words, as a matter of administration policy, the Biden-Harris Administration had not only repudiated Congress's mandate that illegal aliens are removable, it had decided that even further criminality within the United States *after* illegally entering our country and violating our sovereignty might not be enough to stir those charged with carrying out our laws to do their duty.

40.    The Mayorkas Memorandum even went so far as to implicitly recognize its own lawlessness. Trying to justify the Biden-Harris Administration's policies of near-complete abdication of the Executive's responsibilities, the Mayorkas Memorandum claimed: "Numerous times over the years, and presently, bipartisan groups of leaders have recognized these noncitizens' contributions to state and local communities and *have tried* to pass legislation that would provide a path to citizenship or other lawful status for the approximately 11 million undocumented noncitizens." Mayorkas Memorandum at 2 (emphasis added). Underneath an effort to obfuscate reality by emphasizing the Biden-Harris Administration's policy preferences, this is little more than an admission that Congress has repeatedly considered—and expressly *rejected*—the policy of amnesty/nonenforcement that this memorandum made Executive policy.

41.    On April 3, 2022, then-U.S. Immigration and Customs Enforcement ("ICE") Principal Legal Advisor Kerry Doyle promulgated a memorandum to the ICE Office of the Principal Legal Advisor ("OPLA") attorneys detailing implementation of the Mayorkas Memorandum within OPLA. Kerry E. Doyle, *Guidance to OPLA Attorneys Regarding the*

11

*Enforcement of Civil Immigration Laws and the Exercise of Prosecutorial Discretion*, Apr. 3, 2022, https://perma.cc/5BXG-7HYH ("Doyle Memorandum").

42.    The Doyle Memorandum formalized implementation of the Mayorkas Memorandum, directing that OPLA attorneys formally categorize cases within their computerized tracking system (PLAnet) as "priority" or "nonpriority" based on Mayorkas Memorandum guidance.

43.    The Doyle Memorandum explicitly encouraged OPLA attorneys not to pursue removal against "nonpriority" illegal aliens and, where removal proceedings had already been initiated, to seek termination or closure of such cases. *See* Doyle Memorandum at 10 ("Noncitizens determined not to be priorities for enforcement may receive prosecutorial discretion. The OPLA-preferred forms of prosecutorial discretion for nonpriority cases are either non-filing of the NTA or, if the NTA has already been filed, dismissal of proceedings. OPLA attorneys may, in appropriate cases, consider alternative forms of prosecutorial discretion, including administrative closure, stipulations to issues or relief, continuances, not pursuing an appeal, joining motions to reopen, and stipulations in bond hearings, but OPLA's strong preference is to efficiently remove nonpriority cases from the docket altogether to best focus enforcement resources on Departmental priority cases.").

44.    As if to emphasize that even removable aliens already in removal proceedings were to be protected from the legal consequences of their actions, in direct defiance of the laws as promulgated by Congress, the Doyle Memorandum emphasized that: "In performing their duties, OPLA attorneys are expected to exercise discretion *at all stages* of the enforcement process in

accordance with the factors and considerations set forth in the Mayorkas Memorandum and this guidance." Doyle Memorandum at 9 (emphasis added).

### IV. The Administrative Closure Rule was promulgated as a component of the Campaign to undermine Immigration Law.

45.    Shortly after the Biden-Harris Administration took office, the AA96 rule was preliminarily enjoined by a district court in California, largely based on alleged APA violations. *See Centro Legal,* 524 F. Supp. 3d 919. Because the Biden-Harris Administration was already planning to rescind the AA96 rule, DOJ agreed to a stay of proceedings, and the matter was not litigated to conclusion. *See Centro Legal*, No. 21-cv-00463-SI, Joint Stipulation and Proposed Order to Hold Case in Abeyance, ECF No. 64 (N.D. Cal. Mar. 24, 2021).

46.    With the AA96 Rule preliminarily enjoined, Attorney General Merrick Garland took aim at the administrative decision AA96 had largely codified (*Matter of Castro-Tum*). In *Matter of Cruz-Valdez*, 28 I&N Dec. 326 (A.G. 2021), Attorney General Garland overruled Matter of Castro-Tum in its entirety and putatively reinstated the administrative closure standards of *Matter of Avetisyan*, 25 I&N Dec. 688 (BIA 2012), and Matter of W-Y-U-, 27 I&N Dec. 17 (BIA 2017).

47.    In his brief opinion, Attorney General Garland acknowledged that the prior opinion had been based not only on regulations, but also on statutory law: "In *Castro-Tum* . . . Attorney General Sessions concluded that administrative closure was not authorized by statute, regulation, or delegation from the Attorney General." *Matter of Cruz-Valdez*, 28 I&N Dec. at 328. Nonetheless, Attorney General Garland relied solely on United States Appellate Court precedent holding that administrative closure was authorized by *regulation* (pre-AA96) and that "*Castro-Tum* departed from long-standing practice." *Id*. at 328–29.

48.     Attorney General Garland offered no statutory authority authorizing indefinite administrative closure, nor in any other way did he address the prior DOJ conclusion, or the conclusion of the Sixth Circuit, that administrative closure was contrary to law. *See Matter of Castro-Tum*, 27 I&N Dec. 271; *Hernandez-Serrano*, 981 F.3d at 465 (noting that the "permanent closure of some 350,000 immigration cases [via administrative closure] was largely contrary to law" and "no one—neither *Hernandez-Serrano*, nor the two circuit courts that have rejected the Attorney General's decision in *Castro-Tum*—has explained how a general authority to close cases administratively can itself be lawful while leading to such facially unlawful results").

49.     On September 8, 2023, the Biden-Harris Administration promulgated the Administrative Closure NPRM, proposing, among other things, to rescind the AA96 Final Rule and to greatly expand administrative closure beyond even its pre-AA96 limits. *See* Administrative Closure NPRM, 88 Fed. Reg. 62,242.

50.     The NPRM proposed to authorize IJs to administratively close any case *with or without cause* "in the exercise of discretion" and "upon the motion of a party." Administrative Closure NPRM at 62,280.

51.     Further, the NPRM proposed to mandate that, absent unusual circumstances, IJs shall administratively close cases where both parties request it, or where one party requests administrative closure and the other party "has affirmatively indicated its non-opposition." *Id*. ("An immigration judge shall grant a motion to administratively close or recalendar filed jointly by both parties, or filed by one party where the other party has affirmatively indicated its non-opposition, unless the immigration judge articulates unusual, clearly identified, and supported reasons for denying the motion." (emphasis added)).

14

52.     After commenters explained, in detail, why the proposed rule was unlawful, *see, e.g.*, CIS Comment (explaining that the INA does not authorize "administrative closure as a method to 'temporarily' or permanently remove cases from a court's calendar on the basis of a 'totality of the circumstances' analysis of the parties' interests"), DOJ nonetheless promulgated the Final Administrative Closure Rule on May 29, 2024. 89 Fed. Reg. 46,742.

53.     Although the final rule adds factors that should be considered, none are treated as dispositive and the standard remains a statutorily baseless "totality of the circumstances." Other than that, the final rule retained substantially the same breadth of administrative closure authority as the NPRM. 89 Fed. Reg. at 46,792.

54.     However, the final rule went so far as to acknowledge explicitly that there need not be any parallel proceeding that could moot or resolve the issues in the adjudication, nor, for that matter, any reason to believe that the "temporarily" administratively closed case would ever be recalendared. 89 Fed. Reg. 46,792 ("Although administrative closure may be appropriate where a petition, application, or other action is pending outside of proceedings before the immigration judge, such a pending petition, application, or other action is not required for a case to be administratively closed.").

55.     Thus, although the Final Rule describes administrative closure as "temporary," it authorizes administrative closure for any reason (or no reason at all) upon request by one party (even over the objection of the other party), *mandates* it for most situations in which both parties request it or one requests it and the other does not oppose, and permits recalendaring only (1) as an act of the IJ's discretion and (2) when one party moves to recalendar. Thus, as a matter of policy, under the Mayorkas and Doyle Memoranda (the governing policies in place when the

Administrative Closure Rule was promulgated), DHS would, in nearly all cases, never make a motion to recalendar as a matter of "prosecutorial discretion."

56.     Thus, the Final Administrative Closure Rule effectively created a permanent form of relief from removal for illegal aliens that was not authorized by Congress, subverted the letter and intent of the INA, defied the statutory mandate that IJs "shall decide whether an alien is removable from the United States," 8 U.S.C. § 1229a(c)(1)(A), and permitted the Biden-Harris Administration to grant back-door amnesty to hundreds of thousands of illegal aliens per year. The Final Rule was part and parcel of the Biden-Harris Administration's lawless campaign to abdicate responsibility for enforcing this nation's immigration laws.

57.     The Administrative Closure Rule remains in full legal force and continues to bind EOIR adjudicators, who must apply its administrative closure provisions to cases before them.

58.     Therefore, this Court should hold unlawful and set aside the Administrative Closure Rule as "not in accordance with law" under the APA, because it is ultra vires and violates the INA's requirements for EOIR adjudication. 5 U.S.C. § 706.

## V.  The Administrative Closure Rule is arbitrary, capricious, an abuse of discretion, not in accordance with law, and otherwise violates the APA.

59.     In promulgating the Final Administrative Closure Rule, the Biden-Harris Administration committed numerous other violations of the APA.

60.     First, the administration leaned into the precise administrative failures that the Northern District of California had used to justify preliminarily enjoining the AA96 Rule in *Centro Legal*. Specifically, the *Central Legal* court found that the AA96 violated the APA because it was part of "'Staggered' Rulemaking" adopted in a "piecemeal method in which the Departments

published this NPRM and other related proposed rules" and policy guidance at different times. *Centro Legal*, 524 F. Supp. 3d at 958.

61.    The Final Rule failed to consider (or even address) the compounding impact of freewheeling administrative closure authority paired with the policy of affirmatively refusing to pursue the immigration cases announced in the Mayorkas and Doyle Memoranda, nor how the Doyle Memorandum's stated expectation that OPLA attorneys "continuously" reevaluate enforcement priorities throughout proceedings might result in meritorious removal cases being nonetheless administratively closed indefinitely.

62.    There is no acknowledgment of or consideration of the intersection of this radical expansion of administrative closure and other policies, such as the Biden-Harris Administration's radical (and ultimately unlawful) expansion of immigration parole, "catch-and-release" policies regarding putative asylum seekers, etc.

63.    Although Plaintiff does not agree with the *Centro Legal* court's analysis, DOJ was clearly not only aware of the holding, but, at least in part, based the Administrative Closure rulemaking process on the premise that *Centro Legal* was correct. *See, e.g.*, Final Administrative Closure Rule, 89 Fed. Reg. at 46,742 ("On September 8, 2023, after reconsidering the AA96 Final Rule, including the comments received during that rulemaking, and the issues identified in the *Centro Legal* litigation, the Department published [the Administrative Closure NPRM]."). Despite *Centro Legal* being, at least in part, the very basis for the challenged rule, DOJ repeated the core alleged errors that formed the basis of the *Centro Legal* preliminary injunction.

64.    EOIR's reliance on *Centro Legal* while making no attempt to reconcile virtually identical procedures with that opinion was arbitrary, capricious, and unlawful.

17

65.     Thus, to an even greater extent than in that case, "because numerous intertwined proposed rules [and policies] were promulgated at different times, including after the close of the comment period in this case, the true impact of the Final Rule was obscured and the public was deprived of a meaningful opportunity to comment. Further, by failing to consider the combined impact of all of these rules [and policy memoranda], EOIR entirely failed to consider an important aspect of the problem." *Centro Legal*, 524 F. Supp. 3d at 962 (cleaned up).

66.     Second, the Administrative Closure Rule failed to consider how hundreds of thousands of facially valid removal cases being indefinitely closed would impact the total population of illegal immigrants present in the United States, or how that increase would impact States, localities, and other parties who rely on the Federal Government to faithfully enforce our immigration laws.

67.     The predictable result of the Administrative Closure Rule has been hundreds of thousands of cases indefinitely removed from IJs' calendars and the Board's docket; that is, hundreds of thousands of removable aliens receiving an unauthorized and unlawful form of "amnesty" that permits them to remain in the United States indefinitely, when, by law, they should face prompt removal.

68.     As of July 31, 2025, EOIR estimated that: "For all inactive pending cases, the average length of time a case has been administratively closed is 6,120 days (approximately 16½ years) and the median length of time is 4,242 days (approximately 11½ years) . . . At the Board of Immigration Appeals, the average length of time a case has been administratively closed is 10,647 days (approximately 29 years) and the median length of time is 12,588 days (approximately 34 years)." EOIR Adjudication Statistics, July 31, 2025, https://perma.cc/3MFH-JSYW. "[B]etween

January 2021 and January 2025, the number of administratively closed cases increased from nearly 278,000 to almost 392,000; over that same time period, EOIR's backlog increased from approximately 1.68 million cases to over 4.1 million cases." PM 25-29 at 5. Objectively, there is little to no truth to the claim that administrative closure represents a temporary delay in adjudication when average delays range from years to decades, depending on the level at which EOIR administratively closes a case; by any reasonable definition, it is functionally a final adjudication of "I decline to adjudicate."

69.     As a direct result of refusing to adjudicate hundreds of thousands of cases that were already in removal proceedings and subject to facially valid notices of removal, the administrative closure rule has permitted countless illegal aliens to remain in the country who would otherwise have been removed. This comes at a substantial cost to States and localities, who must continue to expend resources on services, entitlements, and law enforcement for illegal aliens who should not be in this country at all, and who must bear the burden of crimes committed by the same.

**VI. Texas is irreparably harmed by the Administrative Closure Rule on an Ongoing Basis.**

70.     Removable aliens are permitted to remain in the United States indefinitely when their cases are administratively closed rather than being adjudicated to completion. As a result, the Administrative Closure Rule causes there to be an increased number of removable illegal aliens present in the country and, specifically, in Texas.

71.     The excess illegal aliens residing in Texas as a direct result of the Administrative Closure Rule cause a variety of concrete harms to the State. Primarily, Texas incurs significant fiscal costs due to illegal aliens consuming public services. Since the Rule increases the number of illegal aliens present in Texas, it thereby increases the number of illegal aliens consuming Texas public

19

services. The Rule also jeopardizes Texas's public safety by releasing illegal aliens suspected of criminal offenses. The Rule inflicts the following specific injuries on Texas.

72. First, Texas incurs substantial fiscal costs from illegal aliens utilizing medical welfare programs operated by the State, including Medicaid and Texas Children's Health Insurance ("CHIP").

73. The Texas Health and Human Services Commission ("HHSC") collects data on the number and cost of hospital visits by illegal aliens. In Fiscal Year 2025, HHSC reported 313,742 hospital visits by illegal aliens at a total cost of $1,050,642,864. See Ex. A at ¶¶ 6-7 (Declaration of Victoria Grady). These figures include 42,315 visits covered by Medicaid or CHIP that cost the State $279,674,968. *Id.*

74. Texas is required by federal statute to provide medical care to all persons, regardless of immigration status, through Emergency Medicaid, a subset of Medicaid that offers limited care in emergency situations. Medicaid and Emergency Medicaid are jointly funded by the federal government and the States. Texas is not fully reimbursed for the costs it incurs operating Medicaid and pays those costs out of its budget. Thus, the expense that Texas bears providing Medicaid services to illegal aliens are both federally mandated and uncompensated.

75. Second, Texas must expend additional resources on law enforcement and incarceration of illegal aliens who commit additional crimes. Texas also suffers the damages caused by such crimes against either the State or its citizens.

76. The Texas Department of Criminal Justice ("TDCJ") oversees and operates the State's prisons. TDCJ tabulates the number of "undocumented criminal aliens" in its custody and

estimates the total cost to the State of their incarceration. *See generally* Declaration of Rebecca Waltz, Ex. B.

77.    For the period spanning July 1, 2022, through June 30, 2023, TDCJ held 7,768 illegal aliens. *Id.* at ¶ 6. During the same period, incarcerating these inmates cost the State $191,047,274. Id. TDCJ has borne similar costs in previous years. From July 1, 2021, through June 30, 2022, TDCJ was responsible for 6,914 illegal aliens at a cost of $174,698,428, *Id.* at ¶ 8, and from July 1, 2020, through June 30, 2021, TDCJ held 7,058 illegal alien inmates at a cost of $171,667,641. *Id.* at ¶ 10. While the federal government provides financial assistance to States that incarcerate undocumented aliens who have at least one felony or two misdemeanor convictions for violations of state or local law, these subsidies amount to a fraction the total costs Texas sustains from its custody of illegal aliens who have committed non-federal crimes. *See Id.* at ¶¶ 3, 7, 9, 11.

78.    Third, Texas suffers further pocketbook injuries from the cost of educating school-age illegal aliens. The Fourteenth Amendment—per current precedent—requires States to provide K-12 education to eligible illegal aliens. *See Plyler v. Doe*, 102 S.Ct. 2382, 2391-2402 (1982). Accordingly, Texas must and does offer tax-payer funded primary and secondary schooling to age-appropriate illegal aliens.

79.    The Texas Education Agency ("TEA") provides state-level oversight to Texas's network of public schools. Noncitizen schoolchildren typically cost more to educate than citizen schoolchildren because they need and qualify for bilingual and compensatory education. *See* Declaration of Amy Copeland, Ex. C at ¶ 2. Specifically, a noncitizen pupil receiving bilingual and compensatory education is projected to consume $13,399 in education funding in Fiscal Year 2026.

*Id.* A noncitizen pupil that does not receive bilingual and compensatory education will still cost a projected $11,170 to educate, in the same Fiscal Year. *Id.*

80.    While TEA does not know the exact number of illegal alien children residing in Texas, the Agency calculates a minimum estimate of the costs it expects the State to incur from educating illegal aliens. TEA comes by this estimate using data the federal government publishes of the number of unaccompanied minor children ("UAC") that are unlawfully present in Texas. *Id.* at ¶¶ 3-4.

81.    Using these figures, TEA projects an annual cost of educating illegal alien children of approximately $45.78 million. *Id.* at ¶ 4. This amount will be split between state and local funds. In Texas, the State supplements local education spending, leaving it on the hook for part of the additional cost arising from illegal alien enrollment. *Id.* at ¶¶ 5-6. And the bulk of local education spending is provided by school districts and counties, which are both subdivisions of the State. Accordingly, in the current fiscal year, Texas will spend at least $45.78 million to provide K-12 schooling to illegal aliens.

82.    Because UACs are only a subset of school-age illegal aliens, the total cost of providing K-12 education to illegal immigrants is higher than TEA's estimate. Any additional UAC or other illegal alien enrollee increases Texas's expenditure on K-12 education. *Id.* at ¶ 6.

83.    Fourth, the Administrative Closure Rule endangers public safety because it disproportionately benefits illegal aliens suspected of serious crimes. Administrative closure inherently benefits only illegal aliens against whom removal proceedings have been initiated, and the Trump Administration has prioritized removal of illegal aliens accused of further criminality. Thus, the Rule disproportionately results, in removable national security, public safety, and border

security threats being released indefinitely into the United States, rather than removed as the law commands.

84.     This population is then free to perform the precise acts that made them national security, public safety, and border security threats in the first place—with Texas and its citizens suffering the consequences of EOIR's irresponsible abuse of administrative closure.

85.     Fifth, beyond harm to the public fisc, Texas suffers damage to its sovereignty as a State. Controlling immigration "is an inherent attribute of sovereignty," and it is questionable whether the States would have ratified the Constitution if it had stated that limits on immigration "will be enforced only to the extent the President deems appropriate" because the States "jealously guarded" their sovereignty during the Constitutional Convention. *Arizona v. United States*, 567 U.S. 387, 422, 436 (2012) (Scalia, J., concurring in part and dissenting in part).

86.     There can be little doubt that the Administrative Closure Rule increases the number of illegal aliens in the United States, including Texas. During the Biden-Harris Administration, roughly 129,000 removal cases were administratively closed, the vast majority of which were not recalendared. PM 25-29 at 5.

87.     Further, the Rule actively encourages increased illegal immigration. The unlawful creation of a form of "relief" from removal that permits an illegal alien to remain indefinitely in the United States is about as powerful an incentive as could be provided to a potential illegal entrant.

88.     Indeed, U.S. Border Patrol Chief Raul Ortiz confirmed, prior to promulgation of the Administrative Closure Rule, that this was not only a predictable result of the Administration's nonenforcement policies, but one that had already come to pass. During a July 28, 2022, deposition, Chief Ortiz admitted that since President Biden's election, the number of aliens attempting illegally

to enter the United States had increased substantially and that internal Customs and Border Patrol documents stated that "since President Biden was elected . . . aliens illegally entering the United States perceive that they will be able to enter and remain in the United States." *Florida v. United States*, No. 21-cv-1066, ECF No. 78–3 at 59:12–60:5 (N.D. Fla. 2022) (Deposition of Raul Ortiz, Chief of the U.S. Border Patrol) ("Ortiz Depo.").

89.    Chief Ortiz also agreed that "aliens who cite favorable immigration policy as a reason to come to the United States are perceiving what actually is happening in the United States." *Id*. at 67:22–68:5.

90.    Chief Ortiz further explained that it is essential to detain and remove aliens who illegally enter the United States because when there are no consequences, the number of illegal crossings increases; that "if migrant populations are told that there's a potential that they may be released, that yes, you can see increases [in illegal crossings];" and that if DHS is not detaining and removing aliens who cross illegally, the flow of illegal crossers "will increase." *Id*. at 171:13–172:9, 173:7–12.

91.    Establishing such an incentive structure, and causing such an easily predictable rise in illegal border crossings (which disproportionately affect border States like Texas), is precisely the purpose and effect of the Administrative Closure Rule.

92.    The Rule creates an avenue outside of any authorization by Congress for illegal aliens to be released from custody and permitted to remain in the United States indefinitely. Its existence explicitly conveys the possibility of such lawless presence to potential border crossers.

93.    Illegally present aliens tangibly harm the State of Texas, and that harm is proportional to their number. Federal law requires Texas to spend significant amounts of money

providing services to illegal aliens while the federal government's lax immigration policies keep these costs high. As the Administrative Closure Rule continues to increase the number of illegal aliens in Texas, the State's injuries deepen.

**VII.        Texas has standing to challenge the Administrative Closure Rule**

94.        To have standing, a plaintiff must have "an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." Davis v. Fed. Election Comm'n, 554 U.S. 724, 733 (2008) (citation omitted).

95.        As detailed above, Texas suffers irreparable harm—to its sovereignty, the safety of its citizen, and the public fisc—when the federal government administratively closes meritorious removal cases. This harm stems directly from the illegal aliens permitted to remain indefinitely in the United States by administrative closure rather than having their cases adjudicated to completion, and removed. It also stems from the predictable increase in illegal immigration, as the Administrative Closure Rule is a direct and well-understood incentive for potential migrants to enter the United States illegally. *See Dep't of Comm. v. New York*, 588 U.S. 752, 768 (2019) (finding standing where "third parties will likely react in predictable ways"). Some of these effects of the Administrative Closure Rule's take place in Texas, and Texas is affected by illegal immigration into "the entire United States" because "injury to a State can flow from the fact that aliens are 'free to move among states.'" *Tex. v. United States*, 524 F. Supp. 3d 598, 624 (S.D. Tex. 2021) (quoting *Tex. v. United States*, 809 F.3d 134, 188 (5th Cir. 2015)).

96.        "[E]ven 'a dollar or two' of fairly predictable costs as a result of agency action show standing." *Texas v. United States Dep't of Homeland Sec.*, 756 F. Supp. 3d 310, 346 (E.D. Tex. 2024)

(quoting Sprint Commc'ns Co., L.P., 554 U.S. at 289); *see also Czyzewski v. Jevis Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"). "Federal law affirmatively requires the States to make some of those expenditures" on aliens present in the State, so Texas is unable to avoid this harm. *Texas v. Biden*, 20 F.4th 928, 969 (5th Cir.2021) (citing, 42 C.F.R. § 440.255(c) (Emergency Medicaid)) rev'd. on other grounds *Biden v. Texas*, 597 U.S. 785 (2022).

97. The presence of illegal aliens in Texas imposes concrete fiscal costs on the State due to the strain they place on non-discretionary public services. These costs are traceable to the Administrative Closure Rule because the Rule increases the number of illegal aliens in the United States, including in Texas.

98. Separately, the propensity of the Administrative Closure Rule to benefit criminally suspect aliens endangers public safety. *See Tex. v. United States*, 40 F.4th 205, 217-18 (5th Cir. 2022) (finding Texas suffered a cognizable injury from Biden immigration policy that "increases the number of aliens with criminal convictions and aliens with final orders of removal released into the United States").

99. Thus, Plaintiff is and continues to suffer concrete and particularized injuries fairly attributable to the Administrative Closure Rule. Texas has incurred and will continue to incur financial injuries on education, healthcare, and law-enforcement costs that it would otherwise not incur but for the Administrative Closure Rule. These costs are attributable to Defendants' actions both because the Administrative Closure Rule directly increases the number of illegal aliens permitted to remain in the country by indefinitely "closing" meritorious removal cases and because it directly incentivizes increased illegal migration into Texas.

100.    The injuries the Rule causes the State implicates a legally protected interest. *Texas v. United States*, 809 F.3d 134, 152–54 (5th Cir. 2015) ("[T]he states are within the zone of interests of the Immigration and Nationality Act ("INA"); they are not asking us to 'entertain citizen suits to vindicate the public's nonconcrete interest in the proper administration of the laws.'").

101.    Further, vacatur and injunction of the Administrative Closure Rule will redress Plaintiff's injury. Vacating the Rule will eliminate requirements for immigration judges to close cases on a party's motion, and enjoining Defendants from permitting immigration court judges to indefinitely close cases will put an end to the Biden-Harris legacy of de facto granting legal status to aliens who, under the INA, are unlawfully present. This relief will necessarily reduce the number of cases administratively closed and, therefore, reduce the number of illegal aliens permitted to remain indefinitely in the United States contrary to the INA. Further, vacatur of the Rule will remove the explicit incentive it creates for further illegal immigration by eliminating a pathway to indefinite unlawful presence. This will reduce expenditures and protect Texas's sovereignty.

102.    The Administrative Closure Rule was promulgated through notice-and-comment rulemaking and published in the Federal Register as a binding regulation. 89 Fed. Reg. 46,742. Under the APA, it can only be rescinded, modified, or superseded through a new rulemaking that itself complies with the procedural requirements of 5 U.S.C. § 553. No such rulemaking has been initiated. Thus, the Rule remains in full legal force, and EOIR adjudicators remain bound by it.

103.    Nor is this dispute merely hypothetical. Cases continue to be administratively closed under the Administrative Closure Rule, and hundreds of thousands of previously closed cases remain on EOIR's inactive docket, imposing concrete and ongoing harm on Texas. Average closure durations range from approximately 16.5 years at the immigration court level to

approximately 29 years at the BIA level. Each administratively closed case represents a removable alien who remains indefinitely in the United States, generating ongoing costs to Texas in healthcare, education, law enforcement, and other public services that Texas is legally required to provide.

**VIII.    The Court should vacate the Administrative Closure Rule, declare it unlawful, and enjoin the defendants from implementing it.**

104.    For the reasons explained above, the Court should set aside the Administrative Closure Rule and enter a declaratory judgment that it is unlawful.

105.    The Administrative Closure Rule is not authorized by statute, and, in fact, runs counter to the INA's command that: "At the conclusion of the proceeding the immigration judge shall decide whether an alien is removable from the United States. The determination of the immigration judge shall be based only on the evidence produced at the hearing." 8 U.S.C. § 1229a(c)(1)(A). Administrative closure prevents such a decision, and, under the Administrative Closure Rule, results in a determination based on factors not relevant to the hearing under statutory law or precedent.

106.    The Administrative Closure Rule is also unlawful because, despite caveats in the text that are disproven by practice, it creates and authorizes distribution of a form of relief from removal unauthorized by Congress and, in fact, contrary to Congressional standards of removability. Congress enjoys plenary power over immigration law, and EOIR may not usurp this power by creating its own alternative system for granting status or presence in the country.

107.    Because there is no reasonable way to cabin the effects of the unlawful rule so as to prevent harm to Texas, the injunction should be nationwide.

108.    Both the Constitution and Congress have directed that the country needs a uniform, nationwide immigration policy, which requires nationwide relief here. *See Texas v. United States*,

809 F.3d 134 at 187–88. Specifically, "[i]n the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas v. United States*, 50 F.4th 498, 531 (5th Cir. 2022) (quoting *Texas v. United States*, 40 F.4th 205, 229 n.18 (5th Cir. 2022)). In contrast, "[a] more limited remedy would detract from the integrated scheme of regulation created by Congress." *Id.* (cleaned up).

109.    Most importantly, because this is a case under the Administrative Procedure Act, the Supreme Court's recent jurisprudence regarding so-called "nation-wide injunctions" does not impede this Court setting aside the Administrative Closure Rule in its entirety. *See Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025) ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action. *See* 5 U.S.C. § 706(2) (authorizing courts to 'hold unlawful and set aside agency action').")

110.    Indeed, in the Fifth Circuit, "[u]nder prevailing precedent, § 706 'extends beyond the mere non-enforcement remedies available to courts that review the constitutionality of legislation, as it empowers courts to 'set aside'—i.e., formally nullify and revoke—unlawful agency action.'" *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022). Indeed, the APA only recognizes complete vacatur; it makes no allowance for vacatur of a regulation solely as applied to Texas while that regulation continues in other states. When the federal government promulgates an unlawful regulation, "[t]he default rule is that vacatur is the appropriate remedy." *Id.*

**CLAIMS FOR RELIEF**

**Count I**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)**
**Rule in Excess of Defendants' Statutory Authority**

111.    Plaintiff incorporates by reference the preceding allegations as if fully set forth herein.

112.    The Administrative Closure Rule is final agency action reviewable under the APA. *See* 89 Fed. Reg. at 46,788 ("The decision below is, therefore, the final agency determination.").

113.    Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or is "in excess of statutory . . . authority[] or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

114.    The Administrative Closure rule is not in accordance with law and exceeds Defendants' statutory authority to regulate removal proceedings under 8 U.S.C. § 1229a.

115.    Specifically, the Administrative Closure Rule permits IJs and the Board to violate Congress's command that: "At the conclusion of the proceeding the immigration judge shall decide whether an alien is removable from the United States." 8 U.S.C. § 1229a(c)(1)(A).

116.    It has long been understood that an immigration judge "may neither terminate nor indefinitely adjourn the proceedings in order to delay an alien's deportation . . . [and] [o]nce deportation proceedings have been initiated . . . the immigration judge . . . must execute his duty to determine whether the deportation charge is sustained by the requisite evidence in an expeditious manner." *Matter of Quintero*, 18 I&N Dec. 348, 350 (BIA 1982). The Administrative Closure Rule nonetheless allows IJs to exceed their authority by effectively terminating—at a minimum "indefinitely adjourning"—proceedings with no cause to believe that they will ever be resumed or

dependance on outside events that could offer guidance as to how long the indefinite adjournment will last.

117. This conclusion is further bolstered by longstanding separation-of-function principles that dictated that enforcement authority (and, therefore, prosecutorial discretion) did not vest with EOIR adjudicators, who were required to accept DHS decisions to pursue or not pursue removal and were limited to adjudicating the removability of an alien *after* that decision had been made.

118. However, the Administrative Closure Rule implicitly erases this principle by empowering adjudicators, even over DHS objection, to administratively close any case for any reason—or no reason—guided only by their own discretion if requested to do so by the removable alien, with no requirement that the case ever be reopened or finally adjudicated.

119. The Defendants, therefore, have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013). They have "no power to act unless and until Congress" grants it, *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 112 (2d Cir. 2018), yet they have created an alternative form of relief from removal specifically to undermine Congress's statutory plan for regulating immigration into the United States.

120. The Administrative Closure Rule also cannot survive scrutiny under the major questions doctrine. Under *West Virginia v. EPA*, 597 U.S. 697 (2022), and *Biden v. Nebraska*, 600 U.S. 477 (2023), when an agency claims authority to resolve a matter of "vast economic and political significance," courts require "clear congressional authorization" for the agency's action. *West Virginia*, 597 U.S. at 716m 724 (cleaned up). The doctrine applies with particular force where

the agency's assertion of authority is novel, "unheralded," based on "the vague language of an ancillary provision," or where "Congress had conspicuously and repeatedly declined to enact" the very policy the agency seeks to impose. *Id.* at 724 (cleaned up).

121.    Each of these indicia is present here. Through the Administrative Closure Rule, EOIR has asserted the authority to create a *de facto* amnesty program affecting hundreds of thousands of aliens, permitting them to remain indefinitely in the United States—with employment authorization—free from any threat of removal. No statute authorizes administrative closure by EOIR adjudicators. And Congress has "conspicuously and repeatedly declined" to enact the amnesty that the Administrative Closure Rule accomplishes by administrative fiat: as the Mayorkas Memorandum itself acknowledged, "bipartisan groups of leaders . . . *have tried* to pass legislation that would provide a path to citizenship or other lawful status for the approximately 11 million undocumented noncitizens." Mayorkas Memorandum at 2 (emphasis added).

122.    Immigration—and, in particular, the question of whether to grant de facto amnesty to hundreds of thousands of removable aliens—is a matter of "vast economic and political significance" and the subject of "an earnest and profound debate across the country." *West Virginia*, 597 U.S. at 716, 732 (cleaned up). Because Congress did not clearly authorize EOIR to create a system of indefinite non-adjudication that operates as a mass amnesty program, the Administrative Closure Rule exceeds the Defendants' statutory authority.

123.    Therefore, the regulation is unlawful and should be declared as such and set aside.

**Count II**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious Agency Action**

124.    Plaintiff incorporates by reference the preceding allegations as if fully set forth herein.

125.    Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary, capricious or otherwise not in accordance with law or contrary to the Constitution. 5 U.S.C. § 706(2)(A).

126.    "[A]gency action is lawful only if it rests on a consideration of the relevant factors" and all "important aspect[s] of the problem." *Michigan v. EPA*, 576 U.S. 743, 750–52 (2015) (requiring "reasoned decisionmaking" of Executive agencies). This means agencies must "examine all relevant factors and record evidence." *Am. Wild Horse Pres. Campaign v. Purdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).

127.    Particularly where it is obvious, an agency cannot "entirely fail[ ] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also Am. Wild Horse*, 873 F.3d at 931 ("The Service's Finding of No Significant Impact not only failed to take a 'hard look' at the consequences of the boundary change, it averted its eyes altogether.").

128.    Further, agencies must actually analyze the relevant factors. "Stating that a factor was considered . . . is not a substitute for considering it." *Texas v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021) (internal quotation omitted). The agency must provide more than conclusory statements to prove it considered the relevant statutory factors. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016).

129.    The Administrative Closure rule is arbitrary and capricious for several independently sufficient reasons.

130.    *First*, the Defendants arbitrarily did not consider or account for the States' legally recognized reliance interests in the complete adjudication of removal cases.

131. The government is obligated to "turn square corners in dealing with the people." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020) (quoting *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (2020) (Black, J., dissenting)). When an agency changes course, as the Defendants have done here, they must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Id.* at 30 (quoting *Encino Motorcars*, 579 U.S. at 221–22 (2016). In fact, "[i]t would be arbitrary and capricious to ignore such matters." *Id.* (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

132. States have overwhelming reliance interests in federal enforcement of immigration law. Plaintiff's budgets and resource allocations are determined in reliance on Defendants' continued enforcement of immigration law, including adjudicating removal cases to completion as required by statute. The Defendants did not consider whether the States relied on EOIR to fully adjudicate cases brought before it when they were determining how to marshal and distribute their resources to address the number of aliens living illegally in their States and claiming benefits. The Administrative Closure rule is arbitrary and capricious because it utterly ignores these reliance interests. *See Regents of the Univ. of Cal.*, 591 U.S. at 29–32.

133. *Second*, the Defendants gave no consideration whatsoever to the actual costs they imposed on States by releasing illegal aliens indefinitely back into the population.

134. They made no mention of increased expenses for healthcare, education, or other benefits.

135. They made no mention of increased crime or costs associated with law enforcement.

136. They made no mention of the infringement on State sovereignty occasioned by aliens who are *known to be present illegally in the United States* being nonetheless granted an indefinite and legally unauthorized opportunity to continue to reside within the States.

137. They made no mention nor gave any consideration to how incentivizing further illegal migration into the United States would impact the states to which aliens migrated, nor did they consider the particularly damaging consequences such incentives would have for border states like Texas.

138. To the contrary, in both the NPRM and Final Rule, Defendants simply asserted that the Rule "would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government." *See* 88 Fed. Reg. at 62,275; 89 Fed. Reg. at 46,785.

139. These statements are categorically and demonstrably false. Thus, the Administrative Closure rule is arbitrary and capricious.

140. *Third*, the Defendants did not consider how the Administrative Closure Rule incentivizes further illegal migration into the United States.

141. Despite acknowledging that numerous commenters raised this concern, *see, e.g.,* 89 Fed. Reg. at 46,743, Defendants did no more than brush the concern off as "an unfounded assumption," *see* 89 Fed. Reg. at 46,773. The "assumption," however, is far from unfounded—creating an explicit pathway to remain in the United States indefinitely *even after being identified as illegally present and subjected to a Notice to Appear for removal proceedings* is an obvious incentive for potential illegal migrants, and, as explained above, the Biden-Harris Administration's

lax approach to immigration enforcement predictably led to the worst surge of illegal migration into the United States in its history.

142. Brushing off concern that an active incentive to commit unlawful conduct may result in an increase in the incentivized conduct as "an unfounded assumption" is far from adequate consideration. As a result, the Administrative Closure Rule is arbitrary and capricious.

143. *Fourth*, the Defendants entirely failed to consider the interplay between other policies of nonenforcement and the Administrative Closure Rule. For example, there is no mention, let alone adequate discussion, of how the Mayorkas and Doyle Memoranda operate in the context of the Administrative Closure Rule.

144. Since the Mayorkas Memorandum expressly directs DHS personnel not to pursue enforcement in ordinary illegal immigration cases, and to pursue only national security, public safety, and border security threats, the Administrative Closure Rule should reasonably have been expected to operate predominantly on populations that were or had at some point in the proceedings been considered to be such threats.

145. Yet there is no consideration of whether mass administrative closure for such dangerous individuals would operate to disproportionately increase risks to national security, public safety, or border security. There is no consideration of whether combining an express policy of nonenforcement, as articulated in the Memoranda, with a policy of abandoning what little enforcement there is in a large number of cases via administrative closure could multiply the incentives to commit illegal acts.

146. Ironically, both the NPRM and Final Rule cite the *Centro Legal* opinion, 524 F. Supp. 3d 919, as support for promulgating the rule, meaning Defendants were clearly aware of

concern about how other immigration rules and policies could interact; yet they chose to ignore the very same thing in their own rulemaking.

147.    Thus, the Administrative Closure Rule is arbitrary and capricious.

148.    *Fifth*, the Administrative Closure Rule is arbitrary and capricious because Defendants failed to address separation-of-function concerns.

149.    Multiple commenters noted the longstanding legal and regulatory separation-of-function principle holding that those bringing charges, not adjudicators, were to exercise prosecutorial discretion.

150.    However, the rule expressly permits IJs and the Board to administratively close a case upon motion by any party, including over DHS's objection, for any reason or no reason at all—including, by implication, the IJ's or the Board's own judgment about application of prosecutorial discretion.

151.    Because Defendants fail to explain why it is appropriate to discard longstanding separation-of-function principles, the Administrative Closure Rule is arbitrary and capricious.

152.    *Sixth*, the Administrative Closure Rule is arbitrary and capricious because its rationales are obviously pretextual. EOIR has itself admitted that "there is no reliable evidence that administrative closure aids docket management; rather, the opposite has shown to be true." PM 25-29 at 6.

153.    The Rule circumvents the normal order for adjudicating removal cases and creates a pathway to indefinite presence in the United States for illegal aliens, contrary to our immigration law. The Rule is justified by "efficiency" concerns, yet DHS and EOIR personnel are mandated to

constantly reevaluate an extensive list of factors that go far beyond removability to decide, at every stage of adjudication, whether a case should instead be administratively closed.

154.    Further, efficiency is one of the few factors IJs are not authorized by the Rule to consider if both parties move to administratively close a case. Without "unusual, clearly identified, and supported reasons for denying the motion," an IJ must grant administrative closure if both parties so request, even if, in his judgment, it is a *less* efficient course (e.g., if the case is nearing conclusion and the alien is clearly removable).

155.    The Biden-Harris Administration demonstrated a consistent and lawless dedication to open borders ideology, and the Administrative Closure Rule is merely another tool to that end. It was promulgated to undermine immigration enforcement, not to promote efficiency, and so is arbitrary and capricious.

**Count III**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(D)**
**Lack of Notice and Comment**

156.    Plaintiff incorporates by reference the preceding allegations as if fully set forth herein.

157.    The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

158.    The APA requires agencies to publish notice of all "proposed rule making" in the Federal Register, 5 U.S.C. § 553(b), and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," 5 U.S.C. § 553(c). Thus, the Rule can be issued, if at all, only via notice-and-comment rulemaking under the APA. 5 U.S.C. § 553.

159.    Such requirements are not "mere formalities," but rather are "basic to our system of administrative law." *Nat'l Highway Traffic Safety Admin.*, 894 F.3d at 115. "Section 553 was enacted to give the public an opportunity participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those who are regulated." *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984) (quoting *Batterton v. Marshall*, 648 F.2d 694, 705 (D.C. Cir. 1980)); *see also NRDC*, 894 F.3d at 115 (notice and comment serves "the public interest by providing a forum for the robust debate of competing and frequently complicated policy considerations having far-reaching implications and, in doing so, foster reasoned decisionmaking.); *Spring Corp. v. FCC*, 315 F.3d 369, 373 (D.C. Cir. 2003) (notice and comment "ensures fairness to affected parties and provides a well-developed record that enhances the quality of judicial review") (cleaned up)).

160.    Nonetheless, by obscuring the interplay between complementary policies of nonenforcement, the Defendants deprived the public of the opportunity to meaningfully comment on the comprehensive scheme devised by the Biden-Harris Administration.

161.    Further, as explained in Count II, because the Rule was promulgated on the false basis of efficiency, without explanation or even acknowledgment that administrative closure, in practice, is typically something between indefinite and effectively permanent, interested parties were impeded in their ability to comment on the practical effects of the Rule or its operation as, in practice, an alternative and unauthorized form of relief from removal.

162.    Because interested parties were not given adequate information about the rule or how it fit into the larger set of open-border policies promulgated by the Biden-Harris

Administration, they did not have an adequate opportunity to comment on the Rule. The Rule was thus promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## Count IV
### Violation of the Take Care Clause of Art. II, Sec. 3
### of the United States Constitution

163.    Plaintiff incorporates by reference the preceding allegations as if fully set forth herein.

164.    Article II, Section 3 of the Constitution provides that the President has a constitutional duty to "take Care that the Laws be faithfully executed." U.S. CONST. ART. II, § 3.

165.    The Take Care Clause has its roots in the dispute between Parliament and King James II, who was overthrown in the Glorious Revolution of 1688. Parliament was infuriated at King James's use of his purported power to suspend or dispense with Parliament's laws. Zachary Price, *Enforcement Discretion and Executive Duty*, 67 VAND. L. REV. 671, 676, 690–91 (2014). As a result, the subsequent monarchs, William and Mary, agreed to the English Bill of Rights, which stripped the monarchy of all suspending and dispensing authority. *See* Bill of Rights 1688, 1 W. & M. Sess. 2 c. 2 (Eng.)

166.    Considering this historical background, the Framers of the U.S. Constitution unanimously rejected a proposal to grant dispensing powers to the President.

167.    Indeed, the Fifth Circuit recently had occasion to examine the Executive's inability to dispense with the laws. *Texas v. Biden*, 20 F.4th at 978–82. In short, "[t]he Framers agreed that the executive should have neither suspending nor dispensing powers." *Id*. at 980

168.    The Supreme Court has held likewise. *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838). "To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the [C]onstitution,

40

and entirely inadmissible." *Id*. at 613. Any other conclusion "would ... vest[] in the President a dispensing power." *Id*.

169.    Here, the complete abdication of responsibility for enforcing immigration law is particularly egregious. In the Mayorkas Memorandum, the Biden-Harris Administration explicitly abdicated responsibility for enforcing immigration law in the entire category of cases involving "only" immigration law violations. Indeed, the Mayorkas and Doyle Memoranda restrict enforcement to cases that are otherwise explicitly called out as being of particular interest under the INA, for example criminal aliens made removable under 8 U.S.C. 1182.

170.    The Administrative Closure Rule is little more than a tool of this abdication, allowing the Administration to further abandon its responsibility for enforcing this country's immigration laws even where a facially valid Notice to Appear has been issued to a presumptively removable illegal alien. Such a consistent abdication "is a dereliction of duty reviewable in the courts." *Adams v. Richardson*, 480 F.2d 1159, 1163 (D.C. Cir. 1973).

**Count V**
**Non-Statutory Cause of Action**
***Ultra Vires***

171.    Plaintiff incorporates by reference the preceding allegations as if fully set forth herein.

172.    A plaintiff may "institute a non-statutory review action" against an agency head "for allegedly exceeding his statutory authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996). Such non-statutory causes of action survive displacement by the APA. *Id*. at 1329 (citing *Larson v. Domestic & Foreign Comm. Corp.*, 337 U.S. 682, 690–91 (1949)).

173.    For the same reasons as stated in Count I, the Administrative Closure rule exceeds the Defendants' statutory authority to manage caseloads under 8 U.S.C. § 1229a by effectively terminating cases without final adjudication.

174.    The Administrative Closure rule further exceeds the Defendants' statutory authority under the INA by effectively creating a form of relief from removal not authorized by law that operates to permit illegal aliens to remain indefinitely in the United States at the whim of the Executive.

### DEMAND FOR RELIEF

For these reasons, Plaintiff State of Texas asks that the Court:

a. Decree that the Administrative Closure Rule was issued in violation of the APA and vacate, set aside, and permanently enjoin Defendants from implementing it;

b. Declare that the Administrative Closure Rule exceeds Defendants' statutory authority under 8 U.S.C. § 1229a;

c. Declare that no statute authorizes immigration judges to administratively close or suspend adjudication of a case; and

d. Award Plaintiff State of Texas all other relief to which it may be entitled.

Date: June 22, 2026

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

ROB FARQUHARSON
Deputy Attorney General for Legal Strategy

Respectfully submitted.

*/s/ Kyle Tebo*
KYLE TEBO
Special Counsel
Texas Bar No. 24137691

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
LEGAL STRATEGY DIVISION
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Kyle.Tebo@oag.texas.gov

JAMES K. ROGERS*
Senior Counsel
Arizona Bar No. 027287
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave., SE #231
Washington, D.C. 20003
Phone: (202) 964-3721
James.Rogers@aflegal.org

*Pro Hac Vice forthcoming

COUNSEL FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on June 22, 2026 and that all counsel of record were served by CM/ECF.

*/s/ Kyle Tebo*
KYLE TEBO