**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | |
|---|---|
| STATE OF TEXAS, <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF JUSTICE, et al., <br><br> Defendants. | Civ. Action No. 26-cv-00070 |

**DECLARATION OF ABBY SULLIVAN ENGEN, CENTRO LEGAL DE LA RAZA,
IN SUPPORT OF MOTION TO INTERVENE**

Pursuant to 28 U.S.C. § 1746, I, Abby Sullivan Engen, declare under penalty of perjury as follows:

1. I make this sworn statement based on personal knowledge and information provided to me in the course of my employment by colleagues at Centro Legal de la Raza ("Centro Legal"), whom I believe to be reliable.

2. I am the Directing Attorney of the Immigrants' Rights practice at Centro Legal, a non-profit organization with its principal place of business in Oakland, California.

**<u>Centro Legal's Mission and Selected Activities</u>**

3. Centro Legal is a nonprofit legal services organization that protects and advances the rights of low-income individuals through legal representation, education, and advocacy. Our immigration practice serves the needs of the most vulnerable immigrants, including asylum seekers, youth who have survived domestic abuse and other violence, and survivors of trafficking and other violent crimes.

4. Centro Legal has been operating in Oakland, California since 1969, and we have been one of California's leading nonprofit providers of removal defense legal services since 2014.

Our Immigrants' Rights practice has established partnerships with dozens of community-based organizations and school districts, who regularly refer their clients and constituents to our office for immigration legal services. We are one of several nonprofit organizations on the list of immigration legal service providers that DHS subagencies and EOIR distribute to noncitizens seeking legal representation in removal proceedings. It is our mission and goal to provide high-quality, free immigration legal representation to as many indigent noncitizens in removal proceedings as possible.

<u>**The High Demand for Centro Legal's Immigration Legal Services**</u>

5. At present, our immigration legal practice comprises eight attorneys, three Department of Justice accredited representatives, and five support staff. Two additional attorneys will begin employment with us in August and September of 2026, and we are in the process of hiring one additional support staff member.

6. Collectively, our legal team manages over 1,600 open immigration legal matters. Between January and July 2026, Centro Legal staff actively worked on 1,113 cases for existing clients. Our attorneys responded to 36 ICE arrests and provided legal services to these individuals ranging from consultations, release advocacy before ICE, habeas corpus representation in federal court, and assistance with repatriation. Due to our existing demanding workload and the need to respond to an exponential increase in ICE arrests in Alameda County, between January and July of 2026 we commenced full-scope or limited-scope immigration legal representation of only 24 new, non-detained clients.

7. Due to our long-term community presence and consistent reputation for providing high-quality, free immigration legal services, the demand for our services substantially outpaces our capacity. Between the same time period of January through July 2026, over 1,100 nondetained individuals called or walked into our office requesting immigration legal services; 67 detained individuals sought our legal representation; and I estimate that we received an additional 50-70 referrals from community and organizational partners. Therefore, we were able to respond to just under 2% of the demand for our legal representation.

8.      While we can provide formal legal representation to only a small fraction of the unrepresented respondents in removal proceedings who seek our services, we have designed other ways to meaningfully serve these community members. We coordinate and execute an average of one to two workshops or clinics each month, and this year we have prioritized clinics to assist unrepresented respondents to file complete asylum applications to avoid the risk of pretermission of their asylum claims. At each clinic we're able to serve between 10 and 20 community members to file the necessary documents to be able to continue pursuing their asylum claims rather than lose the opportunity to present them to an immigration judge.

### The "Administrative Closure Rule"

9.      The regulation codified at 8 C.F.R. § 1003.18 is titled "Docket management" and sets forth subsections titled "Scheduling," "Notice," "Administrative closure and recalendaring," and "Termination." The order and final judgment issued in this case on June 22, 2026 references the final rule titled "Efficient Case and Docket Management in Immigration Proceedings," promulgated at 89 Fed. Reg. 46,742, and proceeds to refer to this rule as "the Administrative Closure Rule." It then vacates "the Administrative Closure Rule" and enjoins the Department of Justice from promulgating regulations that permit administrative closure of removal proceedings, absent express statutory authority.

10.     At least one Immigration Judge in the San Francisco Immigration Court has raised the question *sua sponte* whether he has authority to *terminate*—not only administratively close—removal proceedings following the District Court's order in this case. Therefore, the Court's order may and will be read to vacate the entire rule now codified at 8 C.F.R. § 1003.18, not simply the provision governing administrative closure.

### Our Office's Reliance on Both Administrative Closure and Termination

11.     Removal defense cases comprise the majority of our practice's collective workload, and I estimate that our attorneys devote 75% of their time to representation of individuals in removal proceedings. Many of our clients—particularly our clients who entered the United States as unaccompanied children fleeing persecution and domestic violence and our clients who

survived violent crimes in the United States—are statutorily eligible for lawful immigration statuses that can be conferred only by U.S. Citizenship and Immigration Services (USCIS); additionally, some clients have a statutory right to pursue such status before USCIS despite being in removal proceedings. Due to USCIS processing times over which neither we nor our clients have any control, our office relies heavily on both administrative closure and termination while our clients' cases proceed before USCIS. These procedures as contemplated in 8 C.F.R. § 1003.18 allow for the conclusion or pausing of clients' removal proceedings so that they can pursue legal protections before USCIS for which they are eligible. In most cases, the strongest forms of relief from removal for our clients whose cases have been terminated or administratively closed pursuant to § 1003.18 must be sought before USCIS.

12. The vast majority of Centro Legal's clients whose removal proceedings have been administratively closed or terminated fall into three primary categories:

 a. **Youth who are eligible for or have been granted Special Immigrant Juvenile Status ("SIJS").** SIJS is a classification for immigrant youth (under 21 years old and unmarried) who have been abused, neglected, and/or abandoned by at least one of their parents, and for whom it would not be in their best interest to return to their country of origin. In order to apply for SIJS before USCIS, a young person must first be placed under the jurisdiction of a juvenile court and must seek findings by a juvenile court judge that establish their SIJS eligibility. These clients have demonstrated to the satisfaction of a juvenile court that they suffered abuse, neglect, and/or abandonment at the hands of their parent(s), and that due to factors such as pervasive violence perpetrated by organized criminal groups, racial discrimination, lack of educational opportunities, and endemic poverty, it is against their best interests to return to their countries of origin.

 b. **Unaccompanied children fleeing persecution in their countries of origin.** Asylum is a legal protection for individuals who have suffered persecution or otherwise have a well-founded fear of persecution on account of race, religion,

nationality, political opinion, or membership in a particular social group, and who are unable to avail themselves of the protection of their countries' governments. Asylum may be a defense to removal for individuals in removal proceedings, and their asylum applications are adjudicated in the adversarial environment of the immigration courts; defensive asylum applicants are routinely cross-examined by attorneys for the Department of Homeland Security about the details of the persecution they claim to have suffered, including rape and other sexual violence, murders and disappearances of their family members, and attempts on their own lives. Asylum may also be sought "affirmatively" before USCIS—typically by someone who entered the United States on a visa or other formal legal status and then claimed a fear of persecution in their country of origin—and this process involves a nonadversarial interview by an Asylum Officer. In recognition of the unique vulnerability of unaccompanied children to human trafficking and other forms of exploitation, Congress passed the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), which vests USCIS with original jurisdiction over these children's asylum claims, even if they are in removal proceedings. This allows unaccompanied children overcoming trauma to present their asylum claims in the nonadversarial setting of USCIS before an Asylum Officer trained in child-specific interviewing techniques, rather than in the adversarial environment of Immigration Court where they will be subjected to cross-examination by government attorneys without such training.

c. **Survivors of violent crimes in the United States.** Congress created U nonimmigrant status (more commonly referred to as the "U visa") in 2000 as a means of encouraging undocumented individuals to report crimes and cooperate with law enforcement. When a noncitizen who lacks immigration status becomes the victim of a violent crime in the U.S. and reports the crime to local law enforcement, they may apply for a U visa. The noncitizen must first obtain a

certification from a local investigatory or prosecutorial authority documenting that they were the victim of a qualifying crime and were helpful in the investigation or prosecution of the crime. The noncitizen must further establish that they suffered substantial abuse due to the crime and that they have continued to cooperate with authorities in the crime's investigation and/or prosecution. If granted, a U visa confers a temporary lawful status that makes the recipient eligible to apply for Lawful Permanent Resident (LPR) status after three years.

13.     All three categories of clients detailed above—Special Immigrant Juveniles, unaccompanied child asylum applicants, and U visa petitioners—are stuck in protracted delays over which they have no control:

a. A SIJS beneficiary can apply for LPR status only when a visa becomes available. For several years, there has been a yearslong wait for the type of visa available to SIJ youth. Therefore, despite Congress creating this protection for abused, neglected, and abandoned youth, many SIJS beneficiaries wait in limbo for several years until a visa becomes available for them to apply for. When these youth are not in active removal proceedings, we do not need to defend them against deportation, and they can instead focus on overcoming the trauma that led them to apply for SIJS, reuniting with family members, pursuing their educational and professional goals, and otherwise building their lives in the United States. We estimate that approved SIJS petitioners this year will wait at least five years before they reach the end of the visa backlog and are able to adjust status to LPR.

b. For several years prior to 2018, with the exception of designating certain nationalities as priorities, the USCIS Asylum Office generally adjudicated asylum cases in the order applications were received. However, in 2018, USCIS announced that it was turning its scheduling procedures on their head in order to combat purported fraud in the affirmative asylum process (of which it produced no evidence). Rather than adjudicating the longest-pending applications first, USCIS

brought back an antiquated "last in, first out" policy ("the LIFO policy"), ostensibly to prevent noncitizens from filing frivolous asylum applications as a means to obtain work authorization for the years their applications remained pending. Pursuant to its LIFO policy, USCIS prioritizes scheduling asylum interviews for applications received in the last 21 days; however, USCIS receives many more asylum applications than it has capacity to schedule for interviews.[1] As a result, most noncitizens whose asylum applications are pending before USCIS have been waiting years for their applications to be adjudicated, with little to no recourse for accelerating USCIS's processing. In recent years, our office has successfully pushed USCIS to adjudicate applications only through mandamus petitions in U.S. District Court,[2] a time-consuming process for which we received no additional funding. Via motions to terminate removal proceedings filed jointly with the Department of Homeland Security as well as unilateral motions citing § 1003.18(d), I estimate that our office secured termination of removal proceedings for over 100 unaccompanied child clients whose asylum applications were pending before USCIS. I estimate that between 30 and 50 additional unaccompanied child clients remain in administratively closed removal proceedings while awaiting USCIS's scheduling of their asylum interviews.

c.  With respect to U visa petitioners, when Congress created the U visa, it vested USCIS with exclusive jurisdiction to adjudicate these petitions and instituted an

---

[1] While USCIS did not release such data for fiscal year 2025, its most recently published data shows that in fiscal year 2024 it received 419,800 asylum applications and adjudicated 126,700. USCIS, Annual Statistical Report FY 2024, *available at* https://www.uscis.gov/sites/default/files/document/reports/fy24_annual_statistical_report_v1.0.pdf.

[2] *See John Doe v. USCIS, et al.*, No. 24-CV-07450-SK (N.D. Cal. 2024); *V.M.G. v. Jaddou, et al.*, No. 24-CV-09314-TLT (N.D. Cal. 2024).

annual cap of 10,000 U visas per year. Over 260,000 U visa petitions are currently pending before USCIS, and they are generally adjudicated in the order received. Therefore, despite furthering the public policy goals Congress envisioned—coming forward to report violent crime without fear of immigration consequences—and qualifying for U nonimmigrant status, I estimate that at least 20 Centro Legal clients remain in administratively closed removal proceedings with no way to expedite the adjudication of their U visa petitions.

14.    In reliance on the established practices of termination and administrative closure as set forth in § 1003.18, Centro Legal has retained hundreds of clients who we otherwise could not have represented. Generally, our retainer agreements with these clients detail the scope of legal representation as representation before USCIS in connection with specific application(s) and representation before the Immigration Court in connection with a motion to terminate or administratively close their removal proceedings. Contrary to the notion that administrative closure amounts to an "indefinite" suspension of a noncitizen's removal proceedings, it is our established practice to move to recalendar and terminate removal proceedings once USCIS has granted an application; moreover, it is USCIS's practice to refer all denials of immigration benefits to removal proceedings.[3]

### Centro Legal's Client Population in Administratively Closed Removal Proceedings

15.    I estimate that 80-100 of our clients are currently in administratively closed removal proceedings. In general, these clients decided (or we made a careful and strategic decision in consultation with the client) to seek to administratively close their removal proceedings in order for them to pursue relief from removal before USCIS. While some also have pending applications for relief for removal before the immigration courts, as a general rule these clients' cases were

---

[3] *See* USCIS, Policy Memorandum PM-602-0187  (Feb. 28, 2025), *available at* https://www.uscis.gov/sites/default/files/document/policy-alerts/NTA_Policy_FINAL_2.28.25_FINAL.pdf; 8 C.F.R. § 208.14(c).

administratively closed based on our assessment that those applications do not comprise their strongest form of relief from removal.

16.    As noted above, the vast majority of our clients in administratively closed proceedings are unaccompanied children who have been abused, neglected, and/or abandoned by their parents and who have applied for or been granted SIJS; unaccompanied children with asylum applications pending before USCIS; and survivors of violent crimes whose U visa petitions are pending before USCIS. We have young SIJS clients whose parents and other adult caregivers deprived them of food, subjected them to forced labor at young ages, beat them on a daily basis, and sexually abused them. We have young asylum-seeking clients who have survived kidnappings and beatings by their local governments in retaliation for their religious and political advocacy, clients who have been group-raped by gangs due to their Indigenous identity and religious devotion, and clients who have survived ritualistic public beatings as punishment for violating social expectations, including for becoming pregnant out of wedlock. Our U visa clients have survived shootings, rape, and violent assaults in the United States, and some have testified at jury trials against the perpetrators and been instrumental in securing criminal convictions.

17.    These clients' pending applications before USCIS have allowed us to secure administrative closure of removal proceedings. In some cases, Immigration Judges have cited 8 C.F.R. § 1003.18(c) as their authority to close these proceedings. For SIJS clients, once a visa becomes available for them to apply to adjust their status to LPR, it is our practice to move to recalendar and terminate their removal proceedings pursuant to 8 C.F.R. § 1003.18(d)(1)(ii)(B) (discretionary termination) so that they can file their application for permanent residency before USCIS. For asylum and U visa clients, we move to recalendar and terminate pursuant to 8 C.F.R. § 1003.18(d)(1)(i) (mandatory termination) once their applications are granted; and, as noted above, their removal proceedings are reactivated if their applications are denied.

18.    Were our clients' removal proceedings recalendared while they remain in the various USCIS backlogs described in paragraph 13, *supra*, we would be forced to seek repeated continuances at best; at worse, we would be forced to litigate asylum or other claims before the

Immigration Court, Board of Immigration Appeals, and Ninth Circuit, expending up to 200 hours per case, despite the likelihood of them eventually being granted lawful status by USCIS.

<u>**How Vacatur Will Harm Centro Legal**</u>

19.     The vacatur of the rule codified at 8 C.F.R. § 1003.18(c) will irreparably harm Centro Legal in several ways. If the vacatur is allowed to stand, we will face exponential and compounding challenges that would make it prohibitively costly to serve our clients meaningfully. With respect to termination, while I am not aware of a substantial number of clients eligible for mandatory or discretionary termination whose removal proceedings remain on the Immigration Court's active docket, assuming the Department of Homeland Security reads the June 22nd decision to eliminate § 1003.18(d) pertaining to termination, I predict that it will recommence removal proceedings for those clients whose cases were terminated pursuant to subsection (d)(1)(ii) (permitting discretionary termination for unaccompanied children with pending TVPRA asylum applications as well as noncitizens who are prima facie eligible for lawful status before USCIS). I estimate that this will propel at least 50 Centro Legal clients back into removal proceedings. With respect to administrative closure, as noted above, I estimate that we currently carry 80-100 administratively closed cases. Once proceedings recommence or are recalendared for these 130-150 clients, I estimate that each case will require approximately 40 to 200 additional hours of staff time, depending on the complexity of the case and whether appeals are required.

20.     Accordingly, as detailed below, first, the vacatur will inflict direct economic losses on Centro Legal. Second, the vacatur will place an untenable burden on our legal staff, who have extremely demanding workloads even without the recalendaring of these cases. Third, the vacatur likely will harm our organizational reputation. Fourth, it will interfere with our core activities of providing free, high-quality immigration legal services to as many indigent community members as possible.

I.     <u>**Economic Harm**</u>

21.     As noted above, our practice provides all immigration legal services pro bono. Not only do we believe strongly in pro bono legal representation, but our largest funder requires as a

condition of funding that we not charge clients any fees for our legal services; and another large funder requires that our "primary purpose and function" be the provision of free legal services to indigent people.

22.     The vast majority of our practice's funding is tied to specific "case deliverables," measured either by a full-time equivalent (FTE) caseload, or by total number of clients. Because nondetained removal defense cases typically last for at least two years and sometimes over a decade, we are extremely careful to open the exact number of cases that our contracts with funders require—no more and no fewer—and assign these cases as equitably as possible. For example, under our largest removal defense grants, we must carry 25 to 35 active removal defense matters per FTE; at present, we are funded to carry a total of 130 to 182 active matters at all times, and we carefully plan to open and close a precise number of cases in order to maintain our total number of matters between 130 and 182.

23.     In addition to our FTE-based grants, for over ten years we received per-case funding for representation of unaccompanied children. This grant provided a set quantity of funds per client, regardless of the complexity and lifetime of the case, and regardless of how many separate legal services we provided to the client (i.e., we received the same funding regardless of how many forms of relief from removal we pursued for each client). This grant requires that we continue to represent the child in connection with appeals of all adverse administrative and judicial decisions. I conservatively estimate that we continue to represent 90-100 of these clients in connection with pending TVPRA asylum applications, pending SIJS petitions, and approved SIJS petitions with a priority date that is not yet current, despite the fact that funding has been depleted. Were these clients suddenly back in active removal proceedings, we would be contractually obligated to represent them through a Circuit Court appeal, yet we would receive no additional funding under the unaccompanied child-specific grant to represent them. Rather, we would receive funding only for those cases that bring our total active matter count to 182.

24.     Similarly, were our administratively closed cases to be subjected to wholesale recalendaring, we would receive funding only for those cases that bring our total active matter

count to 182. We would therefore be forced to perform legal work on well over 182 matters—work that our funding contracts neither anticipate nor pay for. Moreover, this would destroy the value of completed work our funders already paid for—the closures themselves.

25.    The circumstances of Special Immigrant Juveniles bear additional highlighting. As noted above, Congress created SIJS for the purpose of protecting these vulnerable youth from being deported to abusive or otherwise dangerous conditions; and, by definition, a young person who has been granted SIJS has received a juvenile court order concluding that it would be contrary to their best interests to be returned to their country of nationality. Yet the perverse result of vacatur of this rule is that removal proceedings are likely to be recommenced or recalendared for these youth, forcing them to defend against deportation despite USCIS granting them SIJS—while waiting for a visa to become available for a permanent legal status *for which Congress has made them eligible*. *See* 8 U.S.C. § 1255(a), (h) (authorizing SIJs to apply for LPR status and removing many barriers that might otherwise prevent them from becoming LPRs).

26.    Perhaps more critically, if a Special Immigrant Juvenile is removed from the United States, they will be unable to adjust status to become an LPR because only immigrants who are physically present in the United States can adjust status, and the alternative of "consular processing" from overseas is not available to Special Immigrant Juveniles.[4] I estimate that a total of 90 Centro Legal clients who have been conferred SIJS but have not yet adjusted status to LPR either had their removal proceedings terminated or remain in administratively closed removal proceedings.

27.    In general, the Immigration Court has exclusive jurisdiction over adjustment-of-status applications filed by individuals in removal proceedings, with the exception of USCIS

---

[4] USCIS Policy Manual Vol. 7, Part F, ch. 7.C (stating that SIJS beneficiaries must be "physically present in the United States at the time of filing and adjudication of an adjustment application"), https://www.uscis.gov/policy-manual/volume-7-part-f-chapter-7; *id.* Vol. 7, Part A, ch. 1.B, ("Adjustment of status to lawful permanent residence describes the process by which a [noncitizen] obtains U.S. LPR status while physically present in the United States."), https://www.uscis.gov/policy-manual/volume-7-part-a-chapter-1; 22 C.F.R. § 42.11 (denoting SIJS as an "adjustment-only" category).

having jurisdiction over the applications of those who were processed as "arriving aliens" upon their arrival to the United States.[5] The vast majority of our Special Immigrant Juvenile clients were not processed as "arriving aliens," meaning USCIS cannot exercise jurisdiction over their adjustment applications if they are in removal proceedings, whether active or administratively closed. In both the San Francisco and Concord Immigration Courts, it has been standard practice for Immigration Judges to terminate removal proceedings for our clients once their SIJS priority dates become current. I estimate that at least 50 Centro Legal clients whose removal proceedings were terminated have pending applications to adjust status before USCIS. All of these clients filed those applications free of charge,[6] but either they or Centro Legal paid the costs for their immigration medical examinations, a requirement for adjustment eligibility that typically costs between $350-500. The medical examination must be submitted to the adjudicator in a sealed envelope, and it is invalid once opened by someone other than the adjudicator. If these clients' removal proceedings recommence, not only will they or we have to again absorb the costs of a new medical examination, but they will also be required to pay the EOIR filing fee for their adjustment application, unless they qualify for a fee waiver. Unlike USCIS, which requires no fee for SIJS-based adjustments, EOIR's fee is $2,980. Neither our organization nor our clients have the funds to pay this fee.

## II.    **Untenable Burden on Staff**

28.    The full-time equivalent (FTE) based model described above is new over the last few years, whereas for more than a decade, each year we opened all removal defense cases pursuant to a per-case funding model—as many as 500 cases per year. I estimate that over 100 of those cases (for which funding has been depleted)[7] remain on our docket; therefore, our legal staff are perpetually managing full workloads that leave little or no room to take on additional tasks.

---

[5] 8 C.F.R. §§ 245.2 & 1245.2.

[6] *See* USCIS Fee Schedule (Form G-1055), *available at* https://www.uscis.gov/g-1055, at p. 15 (listing fee as $0 for individuals applying to adjust status "as a person seeking or granted Special Immigrant Juvenile classification").

[7] This includes the 90-100 estimate in paragraph 23, above.

29.     Our staffing model is carefully designed with these constraints and challenges in mind, and we consistently review and modify existing attorneys' caseloads to support their wellbeing so that we can reduce burnout and prioritize attorney retention. Because the elimination of administrative closure and the recommencing of previously terminated proceedings will lead to the wholesale reactivation of dozens (if not over 100) current cases handled by Centro Legal, staff will be faced with a Hobson's choice of either terminating legal representation of clients—clients who are extremely unlikely to secure high-quality legal representation due to regional capacity constraints both in the nonprofit sector and private firms—or carrying a larger caseload than they can sustain. Staff will burn out, and organizational morale will plummet.

30.     Likewise, our management team will be burdened by the vacatur. We will be forced to devote time and resources to ensuring that all attorneys and fully accredited representatives are familiar with the consequences of the rule's vacatur, familiarize ourselves with cases that have been largely inactive for several years, and reevaluate case strategy on our 1,600 open immigration cases.

### III.     Organizational Reputation

31.     Our Immigrants' Rights practice maintains strong and collaborative partnerships with several community-based organizations, who refer their clients and constituents to us for legal services. I estimate that we accept 50 to 100 referrals for formal representation or limited-scope services annually from partner organizations. When capacity opens for new cases or limited-scope services, we aim to draw from a variety of referral sources to best serve the extremely diverse immigrant communities across our service area.

32.     The vacatur of this rule will mean that we are wholly unable to accept any new referrals because we will become overwhelmed with new hearings, deadlines, and other demands for cases that previously have been either terminated or administratively closed. At the same time, due to the recommencement of removal proceedings and the recalendaring of inactive cases for the immigrant community at large, our partner organizations will receive even more inquiries from their clients and constituents regarding removal defense legal services. So not only will Centro

Legal be unable to accept the number of referrals that we have consistently accepted over many years, but the referring organizations will be referring even more clients than before.

33.     I am concerned that our inability to accept any new referrals will harm our reputation as a reliable removal defense provider. Over many years, Centro Legal has developed a reputation in the immigration services community as being a steadfast advocate for immigrants, including because we accept regularly referrals from partner organizations. If we stop accepting these referrals because of the consent judgment, our partners may come to rely on other organizations with fewer cases affected by the vacatur that they perceive as more reliable. In addition to this reputational harm, an extended period of time where we are refusing new cases could eliminate funding opportunities in the future. Among the factors funders consider is an organization's relationship with other partners and reputation for reliability.

**IV.     Interference with Performance of Core Activities**

34.     Our most central and critical service is the provision of high-quality, free removal defense representation to as many indigent community members as possible. The vacatur will interfere with our ability to perform this core activity because (1) it will hinder our ability to provide high-quality representation to our existing clients, and (2) the recalendaring or commencement of previously terminated removal proceedings for unrepresented individuals will substantially increase the need for removal defense representation in our service area by the thousands, exacerbating the already sizable gap between the demand for our services and our capacity to meet this demand.

35.     With respect to the first concern, as noted above, we have retained clients for legal services before USCIS and limited the scope of our representation in removal proceedings to moving for termination or administrative closure. In so doing, we have relied heavily on the regulation at issue to assume a specific workload, and that workload will now balloon far beyond what we anticipated. This will unavoidably interfere with our ability to provide high-quality representation to our current clients. At the very least, a notice-and-comment rulemaking process

would have afforded us the opportunity to comment in opposition to this sea change and also to prepare to absorb the additional workload.

36. The vacatur of this rule will lead to the recommencement/recalendaring of many cases that we will be forced to litigate in Immigration Court, most or all of which involve clients whose strongest path to immigration status is before USCIS and who have limited options for relief from removal before an Immigration Judge. As noted above, in most cases we have strategically sought administrative closure because the client's strongest form of relief is (or they have a statutory right to pursue relief) before USCIS; many of these clients' removal proceedings were terminated in the Immigration Court's exercise of discretion, whereas others were administratively closed. For each client whose Immigration Court case recommences or is recalendared, we would be forced to resort either to filing for costly and more fragile forms of relief before the Immigration Court (such as asylum, withholding of removal, protection under the Convention Against Torture, and/or cancellation of removal), consult with and retain expert witnesses who typically charge $700-2000 per case, or to request repeated continuances—all of which would demand significant resources from Centro Legal.

37. In turn, these demands would siphon our limited resources away from accepting new clients and fully representing our current vulnerable clients. In other words, vacatur of the rule and the resulting reactivation of inactive cases will directly impede Centro Legal from fully carrying out some of its core business activities.

38. To give one example of the impact on our other clients, we currently serve dozens of clients who are monolingual speakers of Latin American Indigenous languages. They face extreme challenges finding counsel because very few attorneys have the capacity to hire interpreters, and these Indigenous immigrants are often among the poorest clients and cannot afford to hire their own interpreters. We have carefully invested in building our capacity to work with Indigenous immigrants and hire competent interpreters. If our current cases are recalendared and previously terminated cases recommence en masse, we would be forced to substantially reduce

our representation of Indigenous-language speaking immigrants, leaving one of the most vulnerable immigrant groups even more underserved.

39.     To give another example, we have almost always been able to offer full-scope representation to our immigration clients. This means that we represent them from the time they come to us until they obtain permanent legal status. If our current clients' removal proceedings are reactivated en masse, we would be forced to curtail that practice. Instead, until a substantial number of removal defense cases resolve, we would only be able to afford to offer limited-scope services to new clients, such as filing an asylum application, but then not continuing to represent the client in their removal proceedings or before USCIS. Because of the complexities of immigration law and the challenges facing immigrants seeking status, this reduction in our level of assistance would significantly undermine the effectiveness of our representation, hindering our mission and risking the lives and family-unity of our clients.

### Centro Legal's Prior Litigation

40.     Because of the burdens that the elimination of administrative closure would inflict on Centro Legal, we previously brought suit against the Executive Office for Immigration Review over a 2020 rule that would have eliminated administrative closure. *See Centro Legal de la Raza v. EOIR*, No. 3:21-cv-00463 (N.D. Cal.), Dkt. No. 1 (complaint challenging Appellate Procedure and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 81,588 (Dec. 16, 2020) ("the 2020 rule")).

41.     Centro Legal obtained a preliminary injunction against the 2020 rule, which a district court concluded was likely unlawful. *See Centro Legal de la Raza v. EOIR*, 524 F. Supp. 3d 919 (N.D. Cal. 2021). The parties ultimately stipulated to the dismissal of the case after EOIR promulgated the 2024 Final Rule, which rescinded the 2020 rule and therefore remedied Centro Legal's injuries. *Centro Legal de la Raza v. EOIR*, No. 3:21-cv-00463 (N.D. Cal.), Dkt. No. 109.

42.     The consent judgment in this case vacates the 2024 Final Rule, which has the effect of restoring the 2020 rule. That restoration deprives Centro Legal of the benefit of its prior

litigation and the expectation that the parties' settlement of that litigation would remedy Centro Legal's injuries.

### Conclusion

43.    Centro Legal proudly advances the rights of low-income immigrants through legal representation, education, and advocacy. We serve the needs of the poorest immigrants, including youth, victims of violent crime, and those fleeing violence in their countries of origin. If the vacatur is allowed to stand, and we are forced to devote thousands of hours to litigating previously administratively closed cases, Centro Legal will be greatly limited in our ability to meaningfully represent our clients and continue offering services to our community members.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on August 7, 2026, in Oakland, California.

_____
Abby Sullivan Engen
Directing Attorney, Immigrants' Rights Practice
Centro Legal de la Raza