**In the United States District Court**
**Northern District of Texas**
**Wichita Falls Division**

STATE OF TEXAS.,
PLAINTIFFS,

V.

U.S DEPT. OF JUSTICE ET AL.
DEFENDANTS

CIVIL CASE NO. 7:26-CV-00070-O

**STATE OF TEXAS RESPONSE TO EMERGENCY MOTION TO INTERVENE**

## TABLE OF CONTENTS


State of Texas Response to Emergency Motion to Intervene ........ 1

Table of Contents ........ 2

Table of Authorities ........ 3

Background ........ 8

Legal Standard ........ 9

Argument ........ 10

I. Intervention would be futile because no proposed intervenor has Article III standing to take the proposed appeal. ........ 10

  a. The cities allege contingent fiscal and operational injuries that are speculative. ........ 10

  b. Centro Legal's increased-workload theory is foreclosed by controlling en banc precedent. ........ 12

  c. No Proposed Intervenor articulates a theory of standing that is traceable to the Court's Consent Judgment. ........ 14

II. Intervention would be futile because the Proposed Intervenors are wrong on the merits. ........ 15

  a. The proposed jurisdictional defense fails because the Consent Judgment resolved a live Article III controversy. ........ 16

  b. The INA does not authorize administrative closure as practiced under the Rule. ........ 19

  c. The Consent Judgment does not evade the APA's rulemaking requirements. ........ 22

III. Proposed Intervenors fail to satisfy the requirements for intervention. ........ 22

  a. Proposed Intervenors have no right to intervene because they lack a legally protectable interest. ........ 23

  b. Proposed Intervenors' interests will not be practically impaired. ........ 25

IV. The Court should also deny permissive intervention. ........ 27

Conclusion ........ 28

Certificate of Service ........ 30

## TABLE OF AUTHORITIES

### Cases

*Am. Immigration Lawyers Ass'n v. Reno*,
18 F. Supp. 2d 38 (D.D.C. 1998) *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000) .......... 15

*Apache Bend Apartments, Ltd. v. U.S. Through I.R.S.*,
987 F.2d 1174 (5th Cir. 1993) .......... 24, 25

*Arcos Sanchez v. Att'y Gen.*,
997 F.3d 113 (3d Cir. 2021) .......... 21

*Arizona v. California*,
530 U.S. 392 (2000) .......... 26

*Biden v. Nebraska*,
600 U.S. 477 (2023) .......... 20

*Brumfield v. Dodd*,
749 F.3d 339 (5th Cir. 2014) .......... 26

*Burnett Specialists v. Cowen*,
140 F.4th 686 (5th Cir. 2025) .......... 24

*Bush v. Viterna*,
740 F.2d 350 (5th Cir. 1984) (per curiam) .......... 23, 27

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*,
45 F.4th 846 (5th Cir. 2022) .......... 22

*DeOtte v. Azar*,
332 F.R.D. 173 (N.D. Tex. 2019) (O'Connor, J.) .......... 11

*Diamond v. Charles*,
476 U.S. 54 (1986) .......... 7, 10

*Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice*,
816 F.3d 1241 (9th Cir. 2016) .......... 15

*Hernandez-Serrano v. Barr*,
981 F.3d 459 (6th Cir. 2020) .......... 20

*INS v. Chadha*,
462 U.S. 919 (1983) .......... 8, 17, 18, 19

*Kneeland v. Nat'l Collegiate Athletic Ass'n*,
806 F.2d 1285 (5th Cir. 1987) ....................27

*La Union del Pueblo Entero v. Abbott*,
29 F.4th 299 (5th Cir. 2022).................... 26

*Louisiana Fair Housing Action Center v. Azalea Garden Props.*,
82 F.4th 345 (5th Cir. 2023) ....................13

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .................... 10, 13

*LULAC v. Clements*,
884 F.2d 185 (5th Cir. 1989) ....................27

*Meza Morales v. Barr*,
973 F.3d 656 (7th Cir. 2020)....................21

*New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*,
732 F.2d 452 (5th Cir. 1984) (en banc) ....................23, 25, 27

*Pennsylvania v. New Jersey*,
426 U.S. 660, 664, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976) (per curiam) .................... 11

*Pool v. City of Houston*,
87 F.4th 733 (5th Cir. 2023) ....................17, 18

*Romero v. Barr*,
937 F.3d 282 (4th Cir. 2019)....................21

*Sierra Club v. Espy*,
18 F.3d 1202 (5th Cir. 1994) .................... 26

*Sierra Club v. Glickman*,
82 F.3d 106 (5th Cir. 1996) .................... 24

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ....................10

*Taylor v. Sturgell*,
553 U.S. 880 (2008) .................... 26

*Texas v. United States,* 805 F.3d 653 (5th Cir. 2015)....................23, 24, 25

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015)....................11

*United States v. International Building Co.*,
345 U.S. 502 (1953) .......... 26

*United States v. Texas* ("*Texas In-State Tuition*"),
181 F.4th 548 (5th Cir. 2026) .......... 8, 15

*United States v. Texas* ("*Texas S.B. 4*"),
173 F.4th 659 (5th Cir. 2026) (en banc) .......... 7, 13, 15

*United States v. Texas*,
181 F.4th 548 (5th Cir. 2026) .......... 9, 10

*United States v. Texas*,
599 U.S. 670 (2023) .......... 16, 17

*United States v. Windsor*,
570 U.S. 744 (2013) .......... 8, 17, 18, 19

*Virginia House of Delegates v. Bethune-Hill*,
587 U.S. 658 (2019) .......... 7, 10

*Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*,
834 F.3d 562 (5th Cir. 2016) .......... 23

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 20, 21

*Whitman v. American Trucking Associations*,
531 U.S. 457 (2001) .......... 21

*Williams v. Parker*,
843 F.3d 617 (5th Cir. 2016) .......... 11

*Wyoming v. Oklahoma*,
502 U.S. 437 (1992) .......... 11

**Statutes**

5 U.S.C. § 706(2) .......... 22

8 U.S.C. § 1103(g)(2) .......... 19

8 U.S.C. § 1229a(c)(1)(A) .......... 19

**Other Authorities**

Alejandro Mayorkas, *Guidelines for the Enforcement of Civil Immigration Law*, Sept. 30, 2021, https://perma.cc/DV58-K76U ........................................................................................21

EXEC. OFF. FOR IMMIGRATION REV., U.S. DEP'T OF JUST., *Policy Memorandum 25-29: Cancellation of Director's Memorandum 22-03* at 8 (Apr. 18, 2025) ... 9

Fed. R. Civ. P. 24(a)(2) .........................................................................................................25

**Rules**

*Efficient Case and Docket Management in Immigration Proceedings*, 89 Fed. Reg. 46,742 (May 29, 2024) (the "Final Rule") ........................................................................................ 8, 19, 21

Three municipalities and a legal aid clinic claim the right to join this litigation in the hope that, once in, they can undo a final judgment that neither existing party will appeal. Their request fails at the threshold. An intervenor that alone seeks appellate relief must independently satisfy Article III. *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663–64 (2019); *Diamond v. Charles*, 476 U.S. 54, 68–71 (1986). None of the four movants has alleged a concrete, imminent injury that would permit it to prosecute the proposed appeal.

Proposed Intervenors' asserted injuries depend on a chain of future contingencies. Each movant anticipates the consequences they will face once closed removal cases become active again. Baltimore and Columbus claim they will lose tax revenue because recalendared cases could result in the deportation of their tax-paying residents. All three cities argue that recalendared cases will deter unlawful immigrants from cooperating with city law enforcement as witnesses and informants. Centro Legal bases its standing on the burdens it will face if its clients' currently closed cases are recalendared. Each of these alleged harms presumes a decision to recalendar currently closed proceedings as well as separate decisions to enter and execute a final order of removal. Accordingly, they hinge on a sequence of possible acts taken by independent decisionmakers, making them too speculative and attenuated for Article III.

The Fifth Circuit has foreclosed Centro Legal's standing with pointed clarity, holding that a legal-services organization does not acquire standing merely because a legal change requires it to understand the change, adjust resources, or expand the degree or scope of representation for affected clients. *United States v. Texas* ("*Texas S.B. 4*"), 173 F.4th 659, 665–69 (5th Cir. 2026) (en banc). Centro Legal alleges precisely those consequences and accordingly lacks standing to enter this litigation.

Moreover, the only action that Proposed Intervenors seek to challenge, this Court's Consent Judgment, does not order recalendaring, reopen closed cases, or otherwise tell immigration judges what to do with their backlog of inactive cases. Thus, the Consent Judgment does not set in motion the series of adverse decisions that Proposed Intervenors fear, so their alleged injuries do not satisfy traceability.

Because no Proposed Intervenor has standing to appeal, their entry into this case would be futile. Separately, intervention is futile because Proposed Intervenors are wrong on the merits. The INA does not authorize immigration judges to close removal proceedings without limit. Futility is a threshold inquiry that precedes the Rule 24 factors and applies to defense-side intervenors. *See United States v. Texas* ("*Texas In-State Tuition*"), 181 F.4th 548, 553-54 (5th Cir. 2026). Accordingly, the Court should deny intervention without reaching Rule 24. *See id.* Notwithstanding, Proposed Intervenors fail to demonstrate a legally protectable interest that will be impaired by their absence from the litigation, as required by Rule 24(a)(2).

Finally, Proposed Intervenors' swipes at the Court's jurisdiction are also mistaken. The Administrative Closure Rule remained in legal force and bound EOIR adjudicators when Texas sued. The Consent Judgment changed that legal regime by vacating the Rule and enjoining Defendants from enforcing it. The Government's agreement with a plaintiff's legal position does not eliminate adversity when the challenged rule remains operative and judicial relief changes the parties' legal rights and obligations. *See INS v. Chadha*, 462 U.S. 919, 939–40 (1983); *United States v. Windsor*, 570 U.S. 744, 757–60 (2013).

The Court should therefore deny intervention.

## BACKGROUND

On May 29, 2024, the Department of Justice promulgated the final rule titled *Efficient Case and Docket Management in Immigration Proceedings*, 89 Fed. Reg. 46,742 (May 29, 2024) (the "Final Rule"). Among other changes, the Final Rule authorized immigration judges and the Board of Immigration Appeals to administratively close proceedings under a totality-of-the-circumstances standard, including when no collateral petition, application, or other proceeding was pending. *Id.* at 46,792. It also addressed termination, briefing schedules, background checks, and sua sponte reopening. *Id.* at 46,743, 46,766–67.

In April 2025, the Acting Director of the Executive Office for Immigration Review issued Policy Memorandum 25-29, which stated that EOIR could not and would not defend the Final Rule

in good faith against legal challenge. EXEC. OFF. FOR IMMIGRATION REV., U.S. DEP'T OF JUST., *Policy Memorandum 25-29: Cancellation of Director's Memorandum 22-03* at 8 (Apr. 18, 2025) (hereinafter "PM 25-29"). The memorandum did not itself vacate or suspend the Rule. When Texas filed this action on June 22, 2026, the complaint alleged that the Final Rule "remain[ed] in full legal force and continue[d] to bind EOIR adjudicators." ECF No. 1, Compl. ¶ 57.

Texas and Defendants filed a Joint Motion for Entry of Consent Judgment the same day. ECF No. 3. The Court then entered an Order and Final Judgment under Federal Rule of Civil Procedure 58(a). ECF No. 5. The judgment declared the Final Rule contrary to law, vacated it, permanently enjoined its enforcement, imposed specified prospective injunctive relief concerning future administrative-closure regulations, recorded the parties' waiver of appeal, and dismissed all remaining requests for relief without prejudice. *Id.*

On August 7, 2026, the City of Baltimore, the City of Columbus, the City of New Haven, and Centro Legal de la Raza moved to intervene as defendants under Rule 24(a). ECF No. 6. Their motion states that they seek intervention for the purpose of appealing the Consent Judgment because the existing parties will not appeal. *Id.* at 1. They attached declarations, a proposed answer, and a proposed order. ECF Nos. 6-2 through 6-8.

## LEGAL STANDARD

When a motion to intervene is opposed and the proposed pleading advances defenses no existing party asserts, the Court must first determine whether the proposed intervention is futile. *United States v. Texas*, 181 F.4th 548, 553–54 (5th Cir. 2026). The Court tests the proposed pleading under the general rules governing legal sufficiency: factual allegations are assumed true, the pleading is construed liberally, and the Rule 12(b)(6) standard applies. *Id.* Futility is a threshold inquiry that precedes the factors in Rule 24(a) and (b), and it applies to proposed defense-side intervenors. *Id.*

Here, Proposed Intervenors seek party status solely to appeal. A nonparty cannot appeal a judgment, and intervention is the method by which a nonparty becomes a party. *Id.* at 566. But

intervention does not itself establish appellate standing. An intervenor that alone seeks appellate relief must independently demonstrate a concrete and particularized injury that is fairly traceable to the judgment and likely to be redressed by reversal. *Virginia House of Delegates*, 587 U.S. at 663–64; *Diamond*, 476 U.S. at 68–71.

## ARGUMENT

### I. Intervention would be futile because no proposed intervenor has Article III standing to take the proposed appeal.

Proposed Intervenors do not seek to participate in ongoing merits litigation. They seek party status solely to appeal the Consent Judgment. ECF No. 6 at 1. Because neither existing party will pursue appellate relief, each Proposed Intervenor must independently satisfy Article III. *Virginia House of Delegates*, 587 U.S. at 663–64; *Diamond*, 476 U.S. at 68–71. None does.

#### a. The cities allege contingent fiscal and operational injuries that are speculative.

Article III requires a concrete injury that is "actual or imminent" rather than "hypothetical" as well as "fairly traceable to the challenged action" and redressable by favorable judicial relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). An injury is imminent "if [it] is 'certainly impending' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 409 (2013)). Each Municipal Intervenor claims an injury that is "too speculative for Article III purposes." *Clapper*, 568 U.S. at 409.

Baltimore and Columbus first predict that they will lose income-tax revenue if residents whose proceedings were administratively closed are eventually removed. That theory requires each of the following: recalendaring; an adverse merits decision; a final removal order; execution of that order; the individual's continued residence and taxable employment in the same city absent removal; and a resulting net revenue loss. The declarations do not identify a particular taxpayer likely to satisfy that chain, the amount or timing of any loss, or facts showing that reversal of the Consent Judgment would prevent it. Accordingly, the cities' fiscal injuries assume "a sequence of

events that are simply too attenuated to conclude that the risk of injury is 'imminent.'" *DeOtte v. Azar*, 332 F.R.D. 173, 180 (N.D. Tex. 2019) (O'Connor, J.).

Crucially, the cities' injuries depend on the enforcement decisions of federal officials, over which neither this Court nor the Proposed Intervenors has any control. An injury is not cognizable when "an independent act of a third party was a necessary condition of the harm's occurrence, and it was uncertain whether the third party would take the required step." *Texas v. United States*, 809 F.3d 134, 160 n.68 (5th Cir. 2015). Federal decisions to recalendar closed cases, adjudicate removal and enforce removal orders exceed the scope of this litigation—confined to APA claims against the Final Rule—and touch on the discretion of federal immigration judges and DHS officers.

The cities' reliance on *Wyoming v. Oklahoma*, 502 U.S. 437 (1992), for the proposition that lost tax revenue can establish standing is misplaced. *Wyoming* involved a direct statutory diversion of an identifiable revenue stream, not the multi-step, contingent chain of enforcement decisions at issue here. Proposed Intervenors' financial harms are speculative and derivative.

Baltimore's related claim that it will be injured by the destruction of the value of public money already spent on removal defense through Safe City Baltimore, and by the exhaustion of fixed-award legal-service contracts, ECF No. 6-1 at 7-8, fares no better. The City voluntarily appropriated program funds before judgment. Those expenditures were not nullified by the judgment, and any future incremental cost depends on which matters are recalendared, what additional work is required, whether Baltimore continues the same funding model, and whether it increases future appropriations. Any injury stems from Baltimore's own discretionary policy choice to fund immigration legal services—a choice Baltimore remains free to continue or discontinue regardless of the Rule's status—and is not fairly traceable to the Consent Judgment. *See Williams v. Parker*, 843 F.3d 617, 620 (5th Cir. 2016) (self-inflicted litigation-funding injury is not fairly traceable to the defendant's conduct); *see also Pennsylvania v. New Jersey*, 426 U.S. 660, 664, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976) (per curiam) (holding that fiscal harm to plaintiff state due to its own statutory funding mandate was "self-inflicted" and not "traceable to the challenged conduct of the defendant."). Indeed, Proposed Intervenors' theory of injury depends on predicting the

aggregate behavior of federal immigration authorities across multiple agencies, districts, and years—precisely the type of speculative, contingent harm that falls short of the fairly traceable and cognizable harm required to show standing.

The cities' law-enforcement theory is still more contingent. The cities claim that the Consent Judgment impairs their law enforcement operations by discouraging crime victims from cooperating with police. Even more bizarrely, the cities connect these concerns to the U visa certification process, ignoring the fact that U visa certification is unaffected by the Court's vacation of the Final Rule and remains available to aliens who face active removal proceedings. The cities' suggestion that unlawful immigrants with pending removal cases will not submit U visa applications, even when eligible, merely indulges in speculation about the potential acts of third parties. Further, the declarations do not identify a pending prosecution that will fail, a particular victim or witness likely to cease cooperation, or a concrete municipal expense that will imminently result from the judgment. The asserted injury depends on independent choices by aliens, immigration adjudicators, prosecutors, witnesses, and federal enforcement officials. New Haven's broader predictions concerning health care, workforce effects, culture, and child welfare similarly depend on an asserted future program of "mass deportations," not an identified and imminent injury to the City.

**b. Centro Legal's increased-workload theory is foreclosed by controlling en banc precedent.**

Centro Legal alleges that recalendaring or recommencement of its clients' removal proceedings will require additional legal work, strain fixed funding, reduce its ability to accept new matters, and potentially affect referral relationships. Engen Decl. ¶¶ 19–39, ECF No. 6-3. The en banc Fifth Circuit has decisively rejected this theory of standing for immigration legal-services organizations. A legal-services organization does not acquire Article III standing merely because a legal change "requires it to understand the legal change, to adjust resources in response, or to

increase the degree or scope of legal representation for its current or prospective clients who may be adversely affected." *Texas S.B. 4*, 173 F.4th at 666–67.

That is exactly what Centro Legal alleges. Centro Legal frames its injury as a "Hobson's choice" between terminating existing clients and maintaining an unsustainable caseload. ECF No. 6-1 at 10. However, its asserted burden arises from performing more of the same legal representation it already provides to existing clients. Its fixed-grant structure and decision to continue full-scope representation do not transform that ordinary legal work into a direct regulation of Centro Legal itself. *See Lujan*, 555 U.S. at 562 ("when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.").

In making its organizational standing argument, Centro Legal relies on *Louisiana Fair Housing Action Center v. Azalea Garden Props.*, 82 F.4th 345, 351–52 (5th Cir. 2023). However, that reliance is misplaced. *Louisiana Fair Housing Action Center* held that the organization in that case lacked standing and specifically held that "an organization does not automatically suffer a cognizable injury in fact by diverting resources in response to a defendant's conduct." *Id.* at 353 (quoting *El Paso Cnty. v. Trump*, 982 F.3d 332, 343 (5th Cir. 2020)). Here, any additional casework Centro Legal must perform on recalendared matters flows from its own pre-existing representation commitments to individual clients, not from an imposed diversion away from a specific competing programmatic activity. Centro Legal has not alleged that it must abandon a particular mission-critical initiative to absorb this workload—only that it will have more of the same casework it already performs.

Nor does Centro Legal's predicted reputational injury suffice. ECF No. 6-1 at 11. No referral partner or funder is alleged to have taken adverse action; rather, the theory depends on future perceptions and independent funding decisions. All of its claimed harms are derivative consequences of the same underlying operational burdens it will always face, regardless of the settlement in this case—not independent, legally protectable interests. Because Centro Legal

cannot demonstrate standing through resource allocation or speculative reputational effects, it lacks standing to take the proposed appeal.

Proposed Intervenors also contend that the Consent Judgment effectively revives the 2020 Rule, against which Centro Legal had previously obtained a preliminary injunction. However, the status of the 2020 Rule is not before this Court. The Consent Judgment in this case vacated the 2024 Final Rule; it did not adjudicate the lawfulness of the 2020 Rule or order its reinstatement. Any grievance Centro Legal has regarding the revival or enforcement of the 2020 Rule may be pursued through independent litigation, as Centro Legal has already demonstrated it is capable of doing.

**c. No Proposed Intervenor articulates a theory of standing that is traceable to the Court's Consent Judgment.**

Finally, each of Proposed Intervenors' purported injuries presuppose a mass recalendaring of currently closed removal proceedings. But the Consent Judgment they seek to challenge does not operate on the backlog of closed removal cases nor command the sweeping reorganization of the federal immigration docket that Proposed Intervenors fear. Accordingly, the chain of events that Proposed Intervenors anticipate breaks down at the beginning. Since the Consent Judgment does not require recalendaring, Intervenors' myriad fears of the consequences stemming from reactivated cases—the cities' concerns that recalendared cases will lead to the removal of taxpayers, witnesses and informants as well as Centro Legal's anxieties that its clients' closed cases could be reopened—do not trace back to the Judgment.

Nor does the relief this Court has entered against the Final Rule entail the reopening of the immigration docket as a follow-on consequence. The Court's Judgment ends the authority of immigration judges to close pending and future removal cases without requiring currently closed cases to be recalendared. Its effects on the use of administrative closure are prospective, while Movants' alleged injuries relate to closure decisions already made. Likewise, the scope of this Court's subject matter jurisdiction is limited to hearing the APA claims Texas brought against the Final Rule, which do not challenge past closure decisions.

To show standing to challenge the Judgment, Proposed Intervenors would need to explain how the loss of the Final Rule's provisions harms them going forward. None of the Intervenors even attempts to show this, nor have they made allegations that could support that showing. Vacatur of the Final Rule means that Centro Legal can no longer move to close client cases but *Texas S.B. 4* holds that is no injury because immigration practitioners lack standing merely because a change in applicable law requires them to adjust their legal services. Texas S.B. 4 173 F.4th at 666; *see also Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice*, 816 F.3d 1241, 1249-51 (9th Cir. 2016) (capital defense attorneys lacked standing to challenge new DOJ regulations that altered habeas petition timelines despite alleging the new rule disrupted their litigation strategies). Changes in immigration procedure do not prevent immigration attorneys "from practicing their professions or fulfilling their missions." *Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38 (D.D.C. 1998) (immigration attorneys lacked standing to challenge expedited removal rules) (citation omitted), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000). Separately, because closure is not a form of immigration relief, Intervenors cannot claim vicarious injuries on behalf of their clients or residents now that closure is no longer available.

Because Proposed Intervenors trace the injuries they allege to the recalendaring of currently closed removal proceedings, rather than the Consent Judgment they seek to challenge on appeal, they do not satisfy Article III traceability.

No Proposed Intervenor has shown it has standing to invoke appellate jurisdiction. Intervention for the sole purpose of pursuing an appeal would therefore be futile, and the motion should be denied before the Court reaches the Rule 24 factors. *Texas In-State Tuition*, 181 F.4th at 553–54.

## II. Intervention would be futile because the Proposed Intervenors are wrong on the merits.

Beyond their lack of standing, intervention should be denied because Proposed Intervenors' proposed defenses are futile.

Proposed Intervenors identify four defenses they intend to raise on appeal: (1) that the Court lacked Article III jurisdiction because the parties were "fully aligned"; (2) that the INA affirmatively authorizes administrative closure; (3) that the Consent Judgment improperly evades the APA's notice-and-comment rulemaking requirements; and (4) that the Consent Judgment is overbroad because it vacates the entire Final Rule rather than severing its provisions. None of these defenses has merit, and permitting intervention to pursue them would serve no purpose other than to delay the resolution of this case.

**a. The proposed jurisdictional defense fails because the Consent Judgment resolved a live Article III controversy.**

Proposed Intervenors conflate two distinct questions: whether Texas suffered an injury sufficient to challenge the Final Rule, and whether the action remained genuinely adverse despite DOJ's agreement with Texas's legal position. The record supports both requirements.

Texas alleged that the Final Rule increased the number of removable aliens remaining in Texas and thereby imposed incremental, legally compelled healthcare, education, and correctional expenditures. ECF No. 1, Compl. ¶¶ 70–99. The supporting declarations quantified categories of those expenditures and explained that additional affected residents increase State costs. *See* ECF No. 1-1, Grady Decl. ¶¶ 5–8; ECF No. 1-2, Waltz Decl. ¶¶ 6–13; ECF No. 1-3, Copeland Decl. ¶¶ 2–6.

Proposed Intervenors are incorrect when they claim that "[t]he theory of injury asserted in the Complaint (¶¶ 94–101) closely resembles the one rejected in *United States v. Texas*, 599 U.S. 670 (2023), but the government failed to raise the issue." ECF No. 6-1 at 17. The nature of the challenged agency action distinguishes this case from *United States v. Texas*. There, the States challenged guidelines governing whom DHS should arrest and remove, and they effectively sought an order requiring the Executive Branch to make more arrests. Here, Texas did not ask the Court to compel DHS to arrest, detain, or remove any particular alien—or even to increase the overall number of arrests or removals. Texas instead challenged a binding regulation that governed how immigration judges and the BIA adjudicated cases already placed in removal proceedings and that

authorized—and, in specified circumstances, required—those adjudicators to administratively close pending cases. That challenge presented the familiar question whether an agency regulation exceeded the authority Congress conferred, not a request for judicial supervision of the Executive's case-by-case enforcement choices. Vacatur therefore supplied direct legal relief by eliminating the rule that bound EOIR adjudicators and preventing further adjudications under that rule, without directing the Executive to take any particular enforcement action. *Cf. United States v. Texas*, 599 U.S. 670, 676–82, 684–85 (2023).

More importantly, DOJ's agreement with Texas's legal position did not itself eliminate adversity. The complaint correctly alleged that the Final Rule remained "in full legal force" and continued to bind EOIR adjudicators when suit was filed. Compl. ¶¶ 57, 102. Policy Memorandum 25-29 criticized the Rule and announced that EOIR would not defend it, but the memorandum did not repeal, vacate, or suspend the Rule. Until the Court entered judgment, Defendants remained legally subject to the Rule and had not provided the relief Texas requested.

That is the distinction drawn by *INS v. Chadha* and *United States v. Windsor*. "[I]t would be a curious result if, in the administration of justice, a person could be denied access to the courts because the Attorney General of the United States agreed with the legal arguments asserted by the individual." *Chadha*, 462 U.S. at 939. A justiciable controversy remains when the Government agrees with the plaintiff's legal theory but continues to apply the challenged legal regime or withholds the requested relief, so that the court's judgment has real meaning for the parties. *Id.* at 939–40; *Windsor*, 570 U.S. at 757–60. The Consent Judgment had that effect here: it vacated the Final Rule and enjoined Defendants from enforcing it.

Proposed Intervenors' reliance on *Pool v. City of Houston*, 87 F.4th 733 (5th Cir. 2023), rests on an incomplete account of that decision. They seize on *Pool*'s observation that the parties agreed from the outset that the challenged charter provisions were unconstitutional and assert that this case presents "precisely the [same] situation" because Texas and DOJ agreed that the Final Rule was unlawful and jointly requested relief. ECF No. 6-1 at 17. But Proposed Intervenors omit the critical fact that made *Pool* a "faux dispute," ECF No. 6-1 at 16: the defendant, the City of Houston,

not only agreed with the plaintiffs' legal position, but also represented that it "would and could not enforce" the challenged provisions and "repeatedly and consistently emphasized" that position throughout the litigation. *Pool*, 87 F.4th at 734. Moreover, the appeal in *Pool* concerned only "the wording" of a declaratory judgment addressing provisions that the City had already disclaimed any ability or intention to enforce. *Id.* at 733–34. On those facts, further judicial relief would not alter the City's conduct, prevent any threatened enforcement, or otherwise change the parties' legal relationship; it would merely memorialize a legal conclusion that both sides already accepted. That was the "faux dispute" *Pool* held to be outside Article III. *Id.* at 734.

Nothing comparable was true here. DOJ's conclusion that the Final Rule was unlawful— and its corresponding decision not to defend the Rule in litigation—did not repeal the Rule, vacate it, suspend its legal effect, or relieve EOIR adjudicators of their obligation to follow it. Indeed, Proposed Intervenors' own APA argument depends on that very proposition. They contend that a regulation adopted through notice-and-comment rulemaking remains binding unless and until it is lawfully rescinded through notice and comment, and their proposed answer expressly admits that the Final Rule "remains in effect and binds EOIR adjudicators" absent such lawful rescission. ECF No. 6-7 ¶¶ 57, 102; see also ECF No. 6-1 at 21–23. Thus, when Texas filed suit, it had not already received the relief it sought: the Rule remained operative, EOIR adjudicators remained bound by it, and Texas plausibly alleged that the Rule continued to inflict concrete injuries on the State. The Consent Judgment materially changed that legal regime by declaring the Rule unlawful, permanently enjoining Defendants from enforcing it, and vacating it. ECF No. 5 ¶¶ 2–4. Unlike the declaratory wording at issue in *Pool*, the judgment here had immediate legal consequences for both Texas and Defendants.

That distinction accords with *Chadha* and *Windsor*. Those decisions establish that the Government's agreement with a plaintiff's legal position does not eliminate Article III adversity when the Government has not given effect to that agreement and a judicial decision remains necessary to alter the parties' legal rights or obligations. *See Chadha*, 462 U.S. at 939–40; *Windsor*, 570 U.S. at 756–59. In *Chadha*, the INS agreed that the challenged statute was unconstitutional but

would have deported Chadha absent a judicial judgment. *Chadha* 462 U.S. at 939–40. In *Windsor*, the Executive agreed that DOMA was unconstitutional but continued to enforce it and refused to pay the requested tax refund until a court ordered otherwise. *Windsor*, 570 U.S. at 756–59. The same principle applies here: DOJ's litigation position left the binding Final Rule in place until the Court acted. Proposed Intervenors cannot simultaneously contend, for purposes of their APA argument, that the Final Rule remained legally operative until the Consent Judgment vacated it and, for purposes of their Article III argument, that Texas and DOJ had already achieved the same legal result before judgment was entered. *Pool* does not support that internally inconsistent theory.

**b. The INA does not authorize administrative closure as practiced under the Rule.**

Proposed Intervenors argue that the INA affirmatively authorizes administrative closure and that the Final Rule merely "regularized" a longstanding practice. This defense lacks merit.

The INA directs that "[a]t the conclusion of the proceeding the immigration judge shall decide whether an alien is removable from the United States." 8 U.S.C. § 1229a(c)(1)(A). This mandatory language—"shall decide"—does not permit immigration judges to indefinitely suspend proceedings without ever reaching a determination on removability. The Administrative Closure Rule's authorization of indefinite closure for any reason or no reason at all, even over DHS's objection, is irreconcilable with this statutory command. The Rule even acknowledged that "such a pending petition, application, or other action is not required for a case to be administratively closed," 89 Fed. Reg. at 46,792—meaning cases could be closed with no prospect of resolution whatsoever.

The Proposed Intervenors' argument that the Attorney General's broad rulemaking power under INA § 103(g)(2) supports their case is unavailing. That provision authorizes the Attorney General to "establish such regulations" as he "determines to be necessary" for carrying out his responsibilities under the Act. 8 U.S.C. § 1103(g)(2). However, a general grant of rulemaking authority does not authorize regulations that contradict the Act's substantive commands. The Attorney General may fashion procedural rules to promote the efficient administration of the

immigration system, but he may not promulgate a rule that effectively nullifies the INA's directive that immigration judges "shall decide" removability. The specific statutory command controls over the general delegation.

As the Sixth Circuit recognized, the "permanent closure of some 350,000 immigration cases [via administrative closure] was largely contrary to law" and "no one . . . has explained how a general authority to close cases administratively itself can be lawful while leading to such facially unlawful results." *Hernandez-Serrano v. Barr*, 981 F.3d 459, 465 (6th Cir. 2020). The practice that Proposed Intervenors seek to defend is not "docket management"—it is the indefinite suspension of the INA's adjudicatory mandate, with average closure durations of 16.5 years at the immigration court level and 29 years at the BIA level. Compl. ¶ 68.

Proposed Intervenors' claim about the Attorney General's general rulemaking authority under the INA fails under the Major Questions Doctrine. Under *West Virginia v. EPA*, 597 U.S. 697 (2022), and *Biden v. Nebraska*, 600 U.S. 477 (2023), when an agency claims authority to resolve a matter of "vast economic and political significance," courts require "clear congressional authorization" for the agency's action. *West Virginia*, 597 U.S. at 716, 724 (cleaned up). The doctrine applies with particular force where the agency's assertion of authority is novel, "unheralded," based on "the vague language of an ancillary provision," or where "Congress had conspicuously and repeatedly declined to enact" the very policy the agency seeks to impose. *Id.* at 724 (cleaned up).

Each of these indicia is present here. Through the Administrative Closure Rule, EOIR has asserted the authority to create a de facto amnesty program affecting hundreds of thousands of aliens, permitting them to remain indefinitely in the United States—with employment authorization—free from any threat of removal. No statute authorizes administrative closure by EOIR adjudicators. And Congress has "conspicuously and repeatedly declined" to enact the amnesty that the Administrative Closure Rule accomplishes by administrative fiat: as the Mayorkas Memorandum itself acknowledged, "bipartisan groups of leaders … *have tried* to pass legislation that would provide a path to citizenship or other lawful status for the approximately 11 million

undocumented noncitizens." Alejandro Mayorkas, *Guidelines for the Enforcement of Civil Immigration Law*, Sept. 30, 2021, https://perma.cc/DV58-K76U; ECF No. 1 ¶ 121.

Immigration—and, in particular, the question of whether to grant de facto amnesty to hundreds of thousands of removable aliens—is a matter of "vast economic and political significance" and the subject of "an earnest and profound debate across the country." *West Virginia*, 597 U.S. at 716, 732 (cleaned up). Because Congress did not clearly authorize EOIR to create a system of indefinite non-adjudication that operates as a mass amnesty program, the Administrative Closure Rule exceeds the Defendants' statutory authority. "Congress ... does not ... hide elephants in mouseholes." *Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001). And Congress did not hide the elephant of what is effectively a new amnesty program for aliens in 8 U.S.C. § 1103(g)(2).

Proposed Intervenors cite decisions from the Third, Fourth, and Seventh Circuits for the proposition that administrative closure is a permissible procedural device that does not conflict with § 1229a(c)(1)(A). *See, e.g.*, *Romero v. Barr*, 937 F.3d 282, 287–88 (4th Cir. 2019); *Meza Morales v. Barr*, 973 F.3d 656, 660 (7th Cir. 2020); *Arcos Sanchez v. Att'y Gen.*, 997 F.3d 113, 117 (3d Cir. 2021). However, none of those decisions addressed the Administrative Closure Rule at issue here, which goes far beyond the limited, case-specific administrative closure those courts considered. The Final Rule authorized indefinite closure for any reason or no reason, even without a pending application for relief before another agency, and even over DHS's objection. 89 Fed. Reg. at 46,792. That is a fundamentally different regulatory scheme from the targeted, circumstance-specific closures at issue in the Third, Fourth, and Seventh Circuit cases. Moreover, none of those courts confronted the empirical reality that the overwhelming majority of administratively closed cases are never reopened—a reality that transforms a nominally "temporary" procedural tool into a permanent disposition contrary to the INA's adjudicatory mandate.

**c. The Consent Judgment does not evade the APA's rulemaking requirements.**

Proposed Intervenors argue that the Consent Judgment improperly circumvents the APA's notice-and-comment requirements by effectively repealing a regulation without going through the rulemaking process. This argument misapprehends the nature of the proceeding.

Texas challenged the Administrative Closure Rule on the ground that it exceeded the agency's statutory authority under the APA. DOJ, having independently concluded that the Rule was indefensible, agreed to the entry of judgment. A judicial determination that a regulation is unlawful—whether reached through adversarial litigation or by consent—neither substitutes for nor evades the rulemaking process. It is a separate exercise of judicial authority under the APA, which empowers courts to "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). This power exists precisely for the purpose of vacating agency action that exceeds statutory authority, and its exercise does not depend on whether the agency mounts a vigorous defense.

The APA's notice-and-comment procedures govern the *promulgation and repeal* of regulations by agencies. They do not constrain the authority of federal courts to vacate unlawful agency action. When a court determines that a regulation exceeds the agency's statutory authority, vacatur is the ordinary remedy. *See Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022) ("The default rule is that vacatur is the appropriate remedy."). This is true regardless of whether the agency defended the regulation or conceded its invalidity. The APA does not require courts to sustain a regulation the promulgating agency itself has determined to be unlawful simply because that agency has not yet completed a separate notice-and-comment process to repeal it.

## III. Proposed Intervenors fail to satisfy the requirements for intervention.

The Proposed Intervenors do not claim a statutory right to intervene under Rule 24(a)(1), so they must satisfy the requirements of Rule 24(a)(2):

> It is well-settled that to intervene as of right each of the four requirements of the rule must be met: (1) the application for intervention must be timely; (2) the

> applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; (4) the applicant's interest must be inadequately represented by the existing parties to the suit.

*New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.* ("*NOPSI*"), 732 F.2d 452, 463 (5th Cir. 1984) (en banc) (cleaned up). "If a would-be intervenor fails to meet any one of these requirements then it cannot intervene as a matter of right." *Bush v. Viterna*, 740 F.2d 350, 354 (5th Cir. 1984) (per curiam) (citation omitted).

**a. Proposed Intervenors have no right to intervene because they lack a legally protectable interest.**

To intervene by right, a movant must demonstrate a "legally protectable interest" that is "direct" and "substantial," evidenced by "a stake in the matter that goes beyond a generalized preference that the case come out a certain way." *Texas v. United States ("Texas DAPA"),* 805 F.3d 653, 657 (5th Cir. 2015) (cleaned up). In other words, "an intervenor fails to show a sufficient interest when he seeks to intervene solely for ideological, economic, or precedential reasons; that would-be intervenor merely *prefers* one outcome to the other." *Id*. Intervention is proper if the interest is "concrete, personalized, and legally protectable." *Id.* at 658. A movant may establish a legally protectable interest in a challenge to regulation by showing it is "the intended beneficiar[y] of a government regulatory system" or subject to the regulations being challenged. *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 834 F.3d 562, 569 (5th Cir. 2016). Absent such a showing, a movant that is merely affected by the challenged program demonstrates nothing more than a generalized interest insufficient to support intervention as of right. *See id.* at 567-69; *Texas DAPA*, 805 F.3d at 657.

Proposed Intervenors are neither subject to the Final Rule nor its beneficiaries. The Final Rule does not regulate the public. Instead, it is directed internally at the authority of IJs and the

procedure of immigration courts. Because the Rule does not create obligations that Proposed Intervenors must follow or carry enforcement risks for failure to comply, they are not objects of its regulations. *See e.g., Burnett Specialists v. Cowen*, 140 F.4th 686, 695 (5th Cir. 2025). Similarly, while Proposed Intervenors believe they benefit from administrative closure, the Final Rule does not create valuable entitlements, rights, or property interests that it confers as public benefits. Indeed, Proposed Intervenors take pains to describe administrative closure as a docket management tool that serves the convenience of immigration courts. ECF No. 6-1 at 10-11, 26-28. But if that is accurate, then immigration judges are the only stakeholders with a *direct* interest in the Final Rule.

Accordingly, Proposed Intervenors are not beneficiaries of the Final Rule because the Rule does not make them eligible to receive anything from the Federal Government. As such, their intervention is fundamentally unlike those that the Fifth Circuit has endorsed in APA challenges. *See Texas DAPA,* 805 F.3d at 660-61 (ruling migrants had right to intervene due to their eligibility for DAPA program benefits); *Sierra Club v. Glickman*, 82 F.3d 106, 109 (5th Cir. 1996) (permitting farm lobby's intervention in part because members received USDA subsidies at issue). Since the Rule does not create legal effects that apply to Proposed Intervenors —neither obligations nor benefits—they lack a direct, legally protectable interest in this litigation.

Instead, the concerns that Proposed Intervenors raise reveal "generalized preference[s] that the case come out a certain way." *Texas DAPA*, 805 F.3d at 657. The cities' law enforcement concerns are shared by every jurisdiction in the country and are therefore generalized, not particularized. Every municipality in the country has an interest in encouraging cooperation with law enforcement. An interest common to all those affected by a regulation is a generalized interest insufficient to establish standing. The cities' law enforcement concerns are shared by jurisdictions nationwide and do not give rise to the particularized, legally protectable stake that Rule 24(a)(2) demands. *Apache Bend Apartments, Ltd. v. U.S. Through I.R.S.*, 987 F.2d 1174, 1178 (5th Cir. 1993) (holding that plaintiffs did not have standing because "when the asserted harm is a generalized grievance shared in substantially equal measure by all or a large class ... that harm alone normally does not warrant exercise of jurisdiction" (cleaned up)).

The pocketbook injuries put forward by Baltimore and Columbus founder on the Fifth Circuit's teaching that a "purely economic interest" typically is too general to satisfy Rule 24(a)(2). *NOPSI*, 732 F.2d at 466. *NOPSI* denied intervention to municipal officials who credibly alleged that the litigation's outcome could result in higher energy prices for the City of New Orleans. *Id.* Commenting on its precedent, the Fifth Circuit reasoned that New Orleans' interest was too generic since "every electricity consumer ... and every person who does business with any electricity consumer yearns for lower electric rates." *Texas DAPA*, 805 F.3d at 657-58. Likewise, every municipality seeks to maximize its tax base. An abstract interest in higher tax revenues does not constitute the sort of concrete property interest that Rule 24(a) protects. *Id.* at 658 (*citing Diaz v. S. Drilling Corp.*, 427 F.2d 1118, 1124 (5th Cir.1970)).

Likewise, Centro Legal's injuries are not particular to it. Every legal services provider that relied on the Final Rule's administrative closure and termination procedures in managing its caseload faces the same operational consequences from the Rule's vacatur. The "choice" Centro Legal faces and the reputational effects it anticipates are shared by all legal services providers who structured their practices around the Rule. They do not transform a generalized organizational interest into the personalized, legally protectable stake that Rule 24(a)(2) demands. An interest shared by an entire class of similarly situated organizations is a generalized interest insufficient to confer standing. *Apache Bend Apartments, Ltd.*, 987 F.2d at 1178. The same is true under Rule 24(a)(2).

Proposed Intervenors have demonstrated nothing more than a generalized interest in the continuation of the Administrative Closure Rule. These generalized interests do not satisfy the Rule 24(a)(2) standard.

**b. Proposed Intervenors' interests will not be practically impaired.**

Even assuming Proposed Intervenors possess a legally protectable interest, they must separately show that denial of intervention may, "as a practical matter, impair or impede" their ability to protect that interest. Fed. R. Civ. P. 24(a)(2). Although that burden is modest, the asserted

impairment must be practical rather than merely theoretical. *La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 307 (5th Cir. 2022); *Brumfield v. Dodd*, 749 F.3d 339, 344–45 (5th Cir. 2014). Proposed Intervenors do not make that showing. Their entire impairment analysis merely cross-references their contention that no existing party advanced their preferred position. ECF No. 6-1 at 15. But the absence of a party making their arguments does not, by itself, establish that they are unable to protect the substantive interests they assert. Nor does the fact that intervention is necessary to appeal this particular judgment suffice; otherwise, every nonparty dissatisfied with a judgment would automatically satisfy Rule 24(a)(2)'s impairment requirement.

The Consent Judgment neither imposes obligations on Proposed Intervenors nor adjudicates their legal rights. It runs against DOJ, EOIR, and specified federal officers, and it does not bind Proposed Intervenors through claim or issue preclusion. ECF No. 5 ¶¶ 2–4. Nonparties ordinarily are not bound by a judgment entered in litigation to which they were not parties. *Taylor v. Sturgell*, 553 U.S. 880, 892–93 (2008). And because the judgment was entered by consent rather than after contested adjudication, the legal issues embodied in it ordinarily carry no issue-preclusive effect absent a demonstrated intent to the contrary. *Arizona v. California*, 530 U.S. 392, 414 (2000); *United States v. International Building Co.*, 345 U.S. 502, 505–6 (1953). This case, therefore, differs from decisions finding impairment based on the stare decisis consequences of an adversarial merits ruling. *See Sierra Club v. Espy*, 18 F.3d 1202, 1207 (5th Cir. 1994).

Proposed Intervenors consequently remain free to protect the concrete interests they identify through other means. The cities may continue certifying U visa applications, pursuing their preferred law-enforcement policies, and determining whether and how to fund removal-defense services. Centro Legal may seek continuances or other relief in its clients' individual proceedings and may independently challenge any future agency action, any asserted revival or enforcement of the 2020 Rule, or any agency interpretation concerning termination authority. Indeed, Centro Legal previously brought an independent challenge to the 2020 Rule and obtained preliminary injunctive relief. ECF No. 6-3 ¶¶ 40–42. Proposed Intervenors likewise remain free to

participate in future rulemaking concerning administrative closure, and the Consent Judgment expressly leaves room for regulations supported by an express statutory basis. ECF No. 5 ¶ 3.

The only objective that those avenues cannot accomplish is restoration of this particular 2024 Rule through an appeal of this judgment. But a preference for the continued operation of a particular regulatory regime is not itself a substantive legal right, and Proposed Intervenors cannot use the impairment element to manufacture the legally protectable interest that Rule 24(a)(2) independently requires. Because the Consent Judgment leaves them free to protect their municipal, organizational, and client-specific interests through independent proceedings and other available mechanisms, Proposed Intervenors have not shown that denying intervention would practically impair their ability to protect any legally cognizable interest.

## IV. The Court should also deny permissive intervention.

Although Proposed Intervenors seek only intervention as of right under Rule 24(a), the Court retains discretion to consider permissive intervention under Rule 24(b). "Permissive intervention is wholly discretionary with the district court." *Kneeland v. Nat'l Collegiate Athletic Ass'n*, 806 F.2d 1285, 1289 (5th Cir. 1987). A district court may deny permissive intervention even when the requirements of Rule 24(b) are "otherwise satisfied." *NOPSI*, 732 F.2d at 471. In exercising that discretion, "a district court should consider ... whether the intervenors ... are likely to contribute significantly to the development of the underlying factual issues." *LULAC v. Clements*, 884 F.2d 185, 189 (5th Cir. 1989).

Permissive intervention should be denied here for all the reasons set forth above. Proposed Intervenors' proposed defenses lack merit. Their participation would serve only to delay the finality of a concluded proceeding. To the extent Proposed Intervenors have a unique perspective to offer, they "can contribute usually most effectively and always most expeditiously by a brief amicus curiae and not by intervention." *Bush*, 740 F.2d at 358. Any interests Proposed Intervenors may have in the outcome of this case can be adequately presented through an amicus submission.

## CONCLUSION

For the foregoing reasons, Plaintiff, the State of Texas, respectfully asks that this Court deny Proposed Intervenors' Emergency Motion to Intervene. Should the Court be inclined to permit any participation by Proposed Intervenors, Texas respectfully requests that the Court limit such participation to the filing of an amicus brief.

Date: August 17, 2026

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

ROB FARQUHARSON
Deputy Attorney General for Legal Strategy

Respectfully submitted.

*/s/ Kyle Tebo*
KYLE TEBO
Special Counsel
Texas Bar No. 24137691

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
LEGAL STRATEGY DIVISION
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Kyle.Tebo@oag.texas.gov

James K. Rogers*
Senior Counsel

Brittany E. Bennett*
Counsel

Georgia Bar No. 717377
America First Legal Foundation
611 Pennsylvania Ave., SE #231
Washington, D.C. 20003

Phone: (202) 964-3721
James.Rogers@aflegal.org
Brittany.Bennett@aflegal.org

*Pro Hac Vice forthcoming

COUNSEL FOR STATE OF TEXAS

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on August 17, 2026 and that all counsel of record were served by CM/ECF.

*/s/ Kyle Tebo*
**KYLE TEBO**