**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

State of Texas,

*Plaintiff*,

v.

U.S. Department of Justice *et al.*,

*Defendants*,

and

City of Baltimore, MD; City of Columbus, OH; City of New Haven, CT; and Centro Legal de la Raza,

*Movant-Intervenors*.

Case No. 7:26-CV-00070-O

**REPLY MEMORANDUM IN SUPPORT OF MOVANT-INTERVENORS' EMERGENCY MOTION TO INTERVENE**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT ........................................................................................................ 1

I. Proposed Intervenors Have Article III Standing. ................................................ 1

II. Proposed Intervenors Are Entitled to Intervention of Right. ................................. 5

III. Intervention Would Not Be Futile. .................................................................... 7

A. The Court lacks jurisdiction over this action. ............................................... 7

B. The INA does not prohibit administrative closure. ......................................... 8

C. The Consent Judgment improperly evades DOJ's APA obligations. .................... 9

D. The Consent Judgment exceeds the scope of permissible relief. ....................... 10

CONCLUSION ........................................................................................................ 10

## INTRODUCTION

This case began and ended on a single day because the parties collusively settled it. The Consent Judgment implementing the agreement between Texas and the Department of Justice (DOJ) never received genuine adversarial testing. Article III's case-or-controversy requirement forbids federal courts from participating in such faux litigation with a preordained outcome. Proposed Intervenors seek to intervene for purposes of appeal to press this jurisdictional argument and additional merits arguments in defense of the Final Rule. Texas's opposition offers no valid reason to deny intervention.[1] Instead, it offers a handful of threshold arguments that, if accepted, would defeat its own Article III standing—thereby precluding the Consent Judgment. On the merits, Texas fails to demonstrate that the Final Rule is invalid or that parties can evade the Administrative Procedure Act (APA) through a collusive settlement. And, tellingly, Texas offers not a word in defense of the Consent Judgment's staggering breadth. The motion to intervene should be granted so that Proposed Intervenors can appeal.

## ARGUMENT

### I. Proposed Intervenors Have Article III Standing.

Texas's opposition suffers from two fundamental flaws that run through its entire standing argument. First, Texas holds itself to one standard and the Cities to a stricter one for the same kind of fiscal injury. Second, Texas denies a causal chain—that vacatur leads to recalendaring and removal—that its own complaint affirmatively pleads as certain. The remainder of Texas's brief fares no better, for reasons specific to each Proposed Intervenor's standing.[2]

---

[1] DOJ adopts by reference those arguments, ECF No. 21, at 2, so Proposed Intervenors refer only to Texas's opposition for simplicity. All page numbers refer to ECF-generated pagination.

[2] Despite Texas's apparent assertion otherwise, Opp'n 10, it is sufficient if any one Proposed Intervenor establishes standing. *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017).

**1.** First, Texas contravenes its own theory of standing in an attempt to defeat the Cities' parallel theory. Texas's complaint alleges that even a dollar of increased State spending resulting from delays in deporting non-citizens confers standing, Compl. ¶¶ 96–97; *see* ECF No. 6-1 ("Mot.") at 15, yet Texas's opposition dismisses the Cities' comparable tax-revenue theory as speculative, ECF No. 19 ("Opp'n") 10–11. The Cities' theory cannot be speculative while Texas's parallel theory is concrete.

Second, Texas argues that any harm is not traceable to the Consent Judgment because vacatur of the Final Rule "does not require" that any removal cases be returned to active status and recalendared. Opp'n 14; *see also id.* at 11. That defies basic logic, and it is directly undermined by Texas's own allegations of traceability and redressability. Texas alleged that vacatur "will necessarily reduce the number of cases administratively closed," Compl. ¶ 101; that immigration judges (IJs) are duty-bound to decide removability expeditiously, *id.* ¶ 116; and that only the Final Rule gave IJs discretion to close cases, *id.* ¶ 118—confirming that vacatur eliminates that discretion and undermining Texas's argument (at 11) that IJs' "discretion" breaks the causal link. Texas also insisted that "[t]he predictable result" of the Final Rule is "hundreds of thousands" of noncitizens "will remain in the United States," Compl. ¶ 67. If that argument suffices for Texas's standing allegations, then it should suffice for Proposed Intervenors' as well: recalendaring and removal are the predictable consequences of vacatur of the Final Rule. Mot. 19.

**2.** Beyond these cross-cutting flaws, each of Texas's remaining defenses collapses on its own terms. The Cities assert concrete and specific harms that directly result from the Consent Judgment: (1) loss of specific tax revenues, the mirror image of the fiscal harm Texas itself relies on to establish standing; (2) increased expenditure to re-litigate cases that were administratively closed; and (3) interference with city law enforcement's ability to investigate and prosecute certain crimes, which inflicts an economic harm on the city and constitutes a mirror image of the public-

safety harm Texas alleges. *See* Mot. 15–17. As shown above, Texas's own complaint argues that recalendaring and removal will result from vacatur of the Final Rule.[3]

Texas argues (at 11) that the Cities' reliance on *Wyoming v. Oklahoma*, 502 U.S. 437 (1992), is misplaced because it involved "a direct statutory diversion." That is facially incorrect. There, an Oklahoma statute altered third-party purchasing behavior, which in turn reduced Wyoming's tax revenues. *Id.* at 447–48. Texas also ignores *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ("*Texas DAPA*"), which reinforces the conclusion. Texas sued because the United States announced an immigration policy (DAPA) permitting individuals who met certain criteria to be lawfully present in the United States for a set period—which Texas argued would force it to incur economic losses by issuing driver's licenses to newly lawfully present non-citizens. *Id.* at 147–48. That injury depended on the same causal chain Texas now insists defeats the Cities' standing. As the Circuit explained, it was a predictable consequence of DAPA that beneficiaries would apply for driver's licenses and cause Texas economic harm. *Id.* at 159–60. The same logic applies here: the Consent Judgment predictably leads to reopened removal cases and, ultimately, "a loss of specific tax revenues" when removed individuals cease paying income taxes. Mot. 15–16; *Wyoming*, 502 U.S. at 448. As in *Texas DAPA*, costs imposed through the predictable effects of government action on identifiable third parties confer standing.

Nor are Baltimore's economic harms of lost city-funded work and costlier expenditures on work they committed to undertake self-inflicted. Opp'n 11. After all, "[s]tanding is defeated only if it is concluded that the injury is *so completely due* to the plaintiff's own fault as to break the causal chain." *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 310 (5th Cir. 2023)

[3] Texas also claims that it is speculative that the Consent Judgment will impose concrete costs on the Cities' law-enforcement operations, asserting that any such harm depends on third-party choices. Opp'n 12. Eliminating administrative closure reduces the very incentive the U visa program is designed to create, predictably affecting prosecutions. Mot. 16–17.

(citation omitted). In *Texas DAPA*, the Circuit rejected the argument that Texas's injury was self-inflicted because it chose to provide driver's licenses, explaining that Texas "sued in response to a significant change in the defendants' policies." *Texas DAPA*, 809 F.3d at 158. That logic applies with equal force here. Baltimore is responding to a "significant change in the defendants' policies," and it has no alternative to recover the cost of city-funded work that it will lose or to avoid the added cost of re-litigating cases it has already committed to handling. Mot. 15–16.

Texas's contrary theory has no logical endpoint. Any cost a local government incurs because of a change in federal policy depends, at some level, on its own decision to spend money rather than absorb the harm some other way. If that were enough to make an injury "self-inflicted," no local (or State) government could ever have standing to challenge a federal decision that imposes financial costs. That is not the law (nor, presumably, would Texas want it to be). *Texas DAPA*, 809 F.3d at 156–57.

Centro Legal likewise has shown that it is concretely harmed because (1) reopening administratively closed cases will force it to perform legal work on far more matters than any grant is sized to cover, Mot. 17; (2) recalendaring destroys the value of work Centro Legal's funders already paid for, *id.*; (3) the judgment impairs the organization's core business activities, *id.* at 18; and (4) it inflicts reputational harm, *id.* at 18–19. Texas mistakenly asserts that *United States v. Texas*, 173 F.4th 659 (5th Cir. 2026) (en banc) ("*Texas S.B. 4*"), rejected these theories. There, the Circuit held that an organization did not suffer an Article III injury where it had a broad mandate to provide legal representation to a class of clients and asserted a generalized grievance that it would have to divert its resources to counteract the challenged agency action. *Id.* at 665–69. Centro Legal, however, does not merely claim that it must divert its resources; it demonstrates with particularity that it will incur direct financial injuries because the Consent Judgment will force it

to perform legal work that its grants do not cover and will erase the value of legal work it already was paid to perform. Mot. 18.

Nor does the Circuit's decision call into question the well-established standard that a plaintiff has standing where, as here, a decision "directly affect[s] and interfere[s] with" its "core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). Unlike the plaintiffs in *Texas S.B. 4*, and contrary to Texas's assertion, Opp'n 13, Centro Legal will be forced to abandon core services that it provides due to the Consent Judgment. *See* Mot. 18.

Texas's response to Centro Legal's reputational injury fares no better. As explained above, an injury does not become speculative merely because it depends on the foreseeable reactions of third parties. Centro Legal's unrebutted declaration shows that its partner organizations will send referrals elsewhere once it becomes "wholly unable to accept any new referrals" for an extended period, Mot. 18—a predictable response, not a speculative one. *Contra* Opp'n 13–14.

**II. Proposed Intervenors Are Entitled to Intervention of Right.**

Proposed Intervenors satisfy each of the Rule 24(a) factors for intervention of right. Mot. 19–23. Notably, Texas does not dispute that the motion to intervene was timely filed or that the existing parties do not adequately represent the interests of Proposed Intervenors. Nor does Texas identify any prejudice that it would suffer from permitting intervention for purposes of appeal.

Instead, Texas principally argues that Proposed Intervenors have no cognizable interest because they are neither directly regulated entities nor beneficiaries of the Final Rule. Opp'n 24. It is hard to see how Texas could square that contention with its own claim to Article III standing, as the Rule "does not regulate" Texas either. *Id.* And Texas's own asserted interests in state and local law enforcement, *e.g.*, Compl. ¶¶ 69, 75, 103, 135, undermine any argument that the Cities lack judicially cognizable law-enforcement interests.

That aside, Texas mistakenly offers a cramped view of the interests cognizable under Rule

24(a). The Cities' economic and property interests, for example, plainly support intervention under Circuit precedent. *See supra* pp. 2–4. Those interests closely mirror the interest held to be sufficient to permit intervention for purposes of appeal in *DeOtte v. State*, 20 F.4th 1055 (5th Cir. 2021), where a state sought to intervene after the federal government failed to defend a challenged regulation. *See id.* at 1063. The Circuit held that the state's demonstrated "fiscal injury" arising from the judgment invalidating the rule at issue satisfied Rule 24(a). *Id.* at 1070 (crediting harm to the "state fisc" if the state needed to "fill the void" in federal law left by the adverse judgment). The same is true for the financial injury Baltimore and Columbus would suffer from the loss of income tax revenues. They have a state-law entitlement to those tax revenues. That "property right . . . is therefore distinguishable from the unsupported economic interest" deemed insufficient in the cases on which Texas relies. *In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 251 (5th Cir. 2009).

Centro Legal likewise has a cognizable interest. In addition to its financial and operational harms, its interest in preserving the outcome of its litigation over the 2020 Rule mirrors the interest approved by the Circuit in *City of Houston v. American Traffic Solutions, Inc.*, 668 F.3d 291 (5th Cir. 2012). There, the proposed intervenors—petition organizers for a city charter amendment challenged in the litigation—"demonstrated a particular interest in cementing their electoral victory and defending the charter amendment itself." *Id.* at 294. As a lead plaintiff in the legal challenge to the 2020 Rule, Centro Legal has an equivalent interest in "cementing" its legal victory and defending the Final Rule, which rescinded the 2020 Rule. That interest is particular to Centro Legal, not shared by every immigration services provider. *Contra* Opp'n 25.

The Consent Judgment will impair each of these interests by vacating the Final Rule. *See supra* pp. 4–5. Texas appears to dispute this conclusion (at 26) because the Consent Judgment does not bind Proposed Intervenors, but "[t]he impairment requirement does not demand that the movant be bound by a possible future judgment." *Brumfield v. Dodd*, 749 F.3d 339, 344 (5th Cir.

2014). Proposed Intervenors satisfy their "*minimal*" burden, *id.* at 344 n.2 (citation omitted), by demonstrating "as a practical matter" that the judgment "may" harm their interests, Fed. R. Civ. P. 24(a)(2). Texas adduces no evidence contradicting Proposed Intervenors' declarations demonstrating that vacatur would inflict immediate harms.

## III. Intervention Would Not Be Futile.

Proposed Intervenors have set forth several meritorious bases for reversing or modifying the Consent Judgment, any of which is independently sufficient to demonstrate that an appeal would not be futile.[4]

### A. The Court lacks jurisdiction over this action.

Because the parties are not genuinely adverse, the Court lacks Article III jurisdiction and must dismiss the case. *See* Mot. 24–26; *Pool v. City of Houston*, 87 F.4th 733, 734 (5th Cir. 2023). Texas never denies that the parties "desire precisely the same result." *Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47, 48 (1971). Nor could it. The Joint Motion for Entry of Consent Judgment makes plain that DOJ welcomes the relief Texas seeks in this suit. DOJ's failure to press readily available arguments it would ordinarily make, even aside from any defense of the merits of the Rule—such as contesting Texas's standing or disputing the availability and scope of vacatur and injunctive relief—underscores the anomalous unity of the parties' interests. *See* Mot. 25. Whatever Texas could say in support of its standing, *see* Opp'n 16–17, the relevant fact is that DOJ failed to offer obvious defenses that it would normally press even if it decided not to contest the plaintiff's merits arguments. That failure underscores what is plain from the docket: DOJ has "repeatedly and consistently emphasized its agreement with the plaintiffs throughout this suit," so there is no case or controversy. *Pool*, 87 F.4th at 734.

[4] Proposed Intervenors respectfully preserve the argument that Rule 24(a) does not authorize a full review of the merits in deciding a motion for intervention. Mot. 24 n.3.

Against this backdrop, Texas's reliance on *United States v. Windsor*, 570 U.S. 744 (2013), and *INS v. Chadha*, 462 U.S. 919 (1983), is misplaced. Jurisdiction existed there because the defendant "refus[ed] to give [] effect" to its agreement with the other side's legal position. *Windsor*, 570 U.S. at 756; *accord Chadha*, 462 U.S. at 939. *See also Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 767 n.5 (5th Cir. 2025) (holding that jurisdiction existed when the parties "agree[d] on the underlying constitutional issue" but disagreed on the judicial remedy). Here, by contrast, DOJ immediately capitulated and effectuated its agreement with Texas about the legal merits of the Final Rule—up to and including abandoning its long-held position that the APA does not authorize vacatur. That collaboration prevented the "honest and actual antagonistic assertion of rights" that Article III requires. *Muskrat v. United States*, 219 U.S. 346, 359 (1911).

At a minimum, the parties' agreement implicates "prudential considerations" that favor participation by intervenors "prepared to defend with vigor" the challenged rule. *Windsor*, 570 U.S. at 760–61.

**B. The INA does not prohibit administrative closure.**

The Final Rule represents a valid exercise of DOJ's authority to promulgate regulations necessary to carry out its immigration adjudication functions, 8 U.S.C. § 1103(g)(2). *See* Mot. 26–29. That provision effectuates the "established principle that administrative agencies should be free to fashion their own rules of procedure . . . permitting them to discharge their multitudinous duties." *FCC v. Schreiber*, 381 U.S. 279, 290 (1965). Consistent with the broad statutory language, the Final Rule authorizes the suspension of removal proceedings in certain circumstances, including when the noncitizen is pursuing immigration relief before another agency.

Texas contends that the INA nonetheless precludes administrative closure because "[a]t the conclusion of the proceeding the immigration judge shall decide" removability. Opp'n 19 (quoting 8 U.S.C. § 1229a(c)(1)(A)). That statutory language is inapplicable by its own terms.

Administrative closure does not represent "the conclusion of the proceeding." *See* 89 Fed. Reg. 46742, 46745 (May 29, 2024). Even Texas's own principal authority recognizes that "[a]dministrative closure is not itself a 'disposition' of a case," *Hernandez-Serrano v. Barr*, 981 F.3d 459, 463 (6th Cir. 2020), fatally undermining Texas's argument. Simply put, administrative closure does not conflict with the statutory requirement to decide removability "[a]t the conclusion of the proceeding," 8 U.S.C. § 1229a(c)(1)(A), because it temporarily pauses a proceeding rather than concluding it.

The major-questions doctrine also does not advance Texas's position. *Contra* Opp'n 20–21. This argument rests almost entirely on a mischaracterization of the Final Rule as a kind of "amnesty program." *Id.* Rather, as Proposed Intervenors explained (at 11), administrative closure works in conjunction with other forms of statutorily authorized relief, such as asylum applications processed by U.S. Citizenship and Immigration Services and U visas. *See* 89 Fed. Reg. at 46751 (explaining that "administrative closure is reserved for cases with a realistic possibility of relief outside of EOIR"); *see also, e.g.*, Sullivan Engen Decl. ¶ 12 (providing examples of statutorily authorized relief that may warrant administrative closure). At bottom, Texas's complaint hinges on its subjective belief that administrative closure lasts too long on average. *See* Opp'n 20–21. But Congress has not required that removal proceedings reach a conclusion within a set period of time. In any event, the Final Rule appropriately recognizes that administrative closure may depend on the "anticipated duration of the administrative closure" and the "responsibility of either party, if any, in contributing to any current or anticipated delay." 8 C.F.R. § 1003.18(c)(3)(i)(E)–(F). Administrative closure can be denied if further delay would be inappropriate.

### C. The Consent Judgment improperly evades DOJ's APA obligations.

DOJ effectively rescinded the Final Rule without undertaking notice-and-comment obligations required by the APA. Mot. 29–31. But an agency cannot "circumvent" its notice-and-

comment obligations "merely by confessing that the regulations were defective in some respect." *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982), *aff'd*, 463 U.S. 1216 (1983). Texas itself has recognized as much. In a case where the government ceased defending a rule adopted through notice-and-comment procedures, Texas and other states sought intervention to "require the Biden Administration . . . to respect the duly enacted Rule until it repeals it through notice-and-comment rulemaking." Brief for Petitioners 3, *Arizona v. City & County of San Francisco*, 596 U.S. 763 (2022). Four Justices agreed that such litigation "maneuvers raise a host of important questions," including compliance "with the principles of administrative law." *Arizona*, 596 U.S. at 766 (Roberts, C.J., concurring). Texas's cursory response does not engage with the APA compliance problems it identified in that prior litigation.

Instead, Texas asserts that notice-and-comment obligations do not apply to court orders. Opp'n 22. That is irrelevant—the question is whether *DOJ* complied with the APA. In substance, DOJ repealed a legislative rule by consenting to judgment without ever seeking the views of affected parties, including Proposed Intervenors, on whether the Final Rule should be repealed.

**D. The Consent Judgment exceeds the scope of permissible relief.**

The Consent Judgment also exceeds the scope of any permissible relief because it failed to sever any flawed portions of the Final Rule and because it enjoined future rulemaking absent any basis for such an injunction. Mot. 31–33. Texas fails to offer any defense of the scope of the Consent Judgment. That omission all but concedes that Proposed Intervenors have raised meritorious objections to the Consent Judgment's scope. As a result, even if Texas were correct on the merits, intervention would not be futile. *Cf. Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) (affording the government appellate relief solely on the scope of the remedy).

## CONCLUSION

The Court should grant leave to intervene for purposes of appeal.

August 19, 2026

Respectfully submitted,

*/s/ Simon C. Brewer*
Simon C. Brewer (D.C. Bar 90042403)*
Ally Scher (D.C. Bar 1616379)*
Joshua M. Salzman (D.C. Bar 982239)*
Paul R.Q. Wolfson (D.C. Bar 414759)†
Brian D. Netter (D.C. Bar 979362)*
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
sbrewer@democracyforward.org
ascher@democracyforward.org
jsalzman@democracyforward.org
pwolfson@democracyforward.org
bnetter@democracyforward.org
(202) 448-9090

Andrés Correa (Tex. Bar 24076330)
Yaman Desai (Tex. Bar 24101695)
Lynn Pinker Hurst & Schwegmann
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
acorrea@lynnllp.com
ydesai@lynnllp.com
(214) 292-3639

*Counsel for Movant-Intervenors City of Baltimore, MD; City of Columbus, OH; City of New Haven, CT; and Centro Legal de la Raza*

*Admitted pro hac vice
† Motion for admission pro hac vice forthcoming